James B. Zouras, *pro hac vice* forthcoming
jzouras@stephanzouras.com
Ryan F. Stephan, *pro hac vice* forthcoming
rstephan@stephanzouras.com
Justin M. Caparco, *pro hac vice* forthcoming
jcaparco@stephanzouras.com
**STEPHAN ZOURAS, LLC**
222 West Adams Street, Suite 2020
Chicago, Illinois 60606
Phone: 312-233-1550

Matthew C. Helland, State Bar No. 250451
helland@nka.com
**NICHOLS KASTER, LLP**
235 Montgomery Street, Ste. 810
San Francisco, CA 94104
Telephone: (415) 277-7235

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN CAROLUS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COINBASE GLOBAL, INC., COINBASE INC., and COINBASE BERMUDA SERVICES LIMITED,<br><br>Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Violation of California's Unfair Competition Law,<br><br>2) Breach of Contract, and<br><br>3) Unjust Enrichment.<br><br>**JURY TRIAL DEMANDED** |

Plaintiff BRIAN CAROLUS ("Plaintiff") brings this action on behalf of himself, and all others similarly situated, against Defendants COINBASE GLOBAL, INC., COINBASE, INC., and COINBASE BERMUDA SERVICES LIMITED (collectively "Coinbase"). Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## NATURE OF THE CASE

1.     Coinbase is a leading cryptocurrency exchange boasting a trading volume of $468 billion.[1] Its stated purpose is to "increase economic freedom in the world" by "updat[ing] the century-old financial system by providing a trusted platform" to trade cryptocurrencies.[2]

2.     Despite this lofty goal, Coinbase is a registered "money services business" under the Bank Secrecy Act and is a licensed money transmitter in nearly every state. Yet, Coinbase has failed to comply with basic legal requirements, putting its users at risk of fraud.

3.     This has fueled the rise of a new type of financial scam, known as "pig butchering." In 2023 alone, the Federal Trade Commission ("FTC") reported losses of a staggering $10.4 billion from these types of scams, with that number only growing in 2024.[3] Coinbase could have prevented many of these scams by simply complying with its legal obligations imposed by laws designed to curb this very conduct. Its failure to do so has led to significant financial and emotional harm for numerous individuals who have fallen victim to fraud.

4.     To make matters worse, Coinbase has made explicit promises to its customers to prevent fraudulent activity on its platform, including pledging to reverse transactions it suspects of fraud. And Coinbase continues to represent itself as a "trusted" and "secure" platform to

---

[1] Coinbase Global, Inc., *Annual Report* (Form 10-K) (February 13, 2025), at 7. Available at: https://investor.coinbase.com/financials/sec-filings/default.aspx.

[2] *Id*. at 8.

[3] *As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, FEDERAL TRADE COMMISSION (February 9, 2025), https://www.ftc.gov/news-events/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.

convince consumers to use its platform. Coinbase users are unaware of the significant risks that come with using the Coinbase platform.

5.     Plaintiff thus brings this action asserting claims of: (i) violations of California's Unfair Competition Law; (ii) breach of contract; and (iii) unjust enrichment. Plaintiff brings this action on behalf of a nationwide class for damages, restitution, injunctive relief, and any other relief deemed appropriate by the Court.

## JURISDICTION AND VENUE

6.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1332(d) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, there are more than 100 Class Members, and the matter is a class action in which members of the class are citizens of a different state from that of the defendants.

7.     This Court has personal jurisdiction because Coinbase solicits customers and transacts business in California. Plaintiff is also informed and believes, and thereon alleges, that acts and omissions giving rise to this action occurred in California.

8.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to this action occurred within this District. Specifically, Coinbase executives control the direction of the company in the Northern District of California, and Coinbase's business records are located primarily in this District.

9.     Pursuant to Local Rule 3-2(d), this matter is properly assigned to the San Francisco Division of this district because Plaintiff is informed and believes, and thereon alleges, that this action arose in San Francisco, California.

## PARTIES

10.     Plaintiff Brian Carolus ("Carolus") is, and at all times mentioned herein, was an individual citizen of the State of California. At all relevant times, he was a resident of Los Angeles County. Carolus would like to continue using Coinbase's services in the future if and when they are compliant with the law, as more fully explained below, but he cannot readily determine whether Coinbase's practices have come into compliance.

11.     Defendant Coinbase Global, Inc., is a Delaware corporation that purports to have no principal place of business and is a "remote-first company."[4] However, Coinbase maintains its principal office and business records in San Francisco, where its executives direct, control, and coordinate its corporate operations. Defendant Coinbase, Inc., is a wholly owned subsidiary of Coinbase Global., Inc., and operates the Coinbase platform.

12.     Defendant Coinbase Bermuda Services Limited is a wholly owned subsidiary of Coinbase Global, Inc., and operates Coinbase Wallet ("Wallet"). Wallet is a "self-custody wallet" that allows users to control and store a cryptocurrency's "private key" directly on the user's device.[5] Wallet allows users to establish a decentralized application ("Dapp") wallet and access a digital asset browser and link to decentralized exchanges ("DEXs"). Coinbase users can only use Dapp and access DEX's through the Wallet platform.

## FACTUAL ALLEGATIONS

### I.    Pig Butchering Scams are Wreaking Financial Havoc on Unsuspecting Consumers.

13.     American consumers lost a staggering $10 billion to scams in 2023 alone, according to reports to the Federal Trade Commission ("FTC").[6] Other studies estimate losses

---

[4]  *Post COVID-19, Coinbase Will be a Remote-First Company*, https://www.coinbase.com/blog/post-covid-19-coinbase-will-be-a-remote-first-company (last accessed February 3, 2025).

[5]  *What's the difference between Coinbase.com and Coinbase Wallet?*, https://help.coinbase.com/-en/wallet/getting-started/what-s-the-difference-between-coinbase-com-and-wallet (last accessed February 3, 2025).

[6] *As Nationwide Fraud Losses Top $10 Billion in 2023, FTC Steps Up Efforts to Protect the Public*, FEDERAL TRADE COMMISSION (February 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2024/02/nationwide-fraud-losses-top-10-billion-2023-ftc-steps-efforts-protect-public.

top $1.03 ***trillion*** globally.[7] These numbers are likely underestimated, since the "vast majority of frauds are not reported."[8]

14.    Scams were not always this rampant. In 2020, for example, the FTC reported total losses from imposter and investment scams at a comparatively modest $1.6 billion.[9] In the first three quarters of 2024, those same losses are reported to be $6 billion—on track to top $8 billion—***a 400% increase in just four years***.[10]

15.    A new type of cyber-crime, coined "pig butchering," is primarily responsible for this increase.[11] The FTC characterizes pig butchering scams as "investment" or "imposter" fraud. In 2023, investment scams accounted for $4.8 billion of the reported losses, with an average loss of $8,000; imposter scams accounted for $2.7 billion, with average losses of $800.[12] The magnitude of these losses are increasing exponentially. In the first three quarters of 2024 alone, consumers lost $3.9 billion to investment scams and $2.1 billion to imposter scams—with an average loss of $9,170 and $800 respectively.[13]

---

[7] Betty Lin-Fisher, *Scam losses worldwide this year are $1 trillion*, USA TODAY (November 7, 2024), https://www.usatoday.com/story/money/2024/11/07/scam-victims-1-trillion-losses/75-967565007/.

[8] Emma Flecher, *Social media: a golden goose for scammers*, FEDERAL TRADE COMMISSION (October 6, 2023), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2023/10/social-media-golden-goose-scammers#2.

[9] *The Big View: All Sentinel Report*, FTC CONSUMER SENTINEL NETWORK (Year: 2020; Quarter: All), https://public.tableau.com/app/profile/federal.trade.commission/viz/TheBig-ViewAllSentinelReports/TopReports (last updated November 8, 2024).

[10] *Id*. (Year: 2024; Quarter: All).

[11] *Crypto Scam Revenue 2024: Pig Butchering Grows Nearly 40% YoY as Fraud Industry Leverages AI and Increases in Sophistication*, CHAINALYSIS (Feb. 13, 2025), https://www.chainalysis.com/blog/2024-pig-butchering-scam-revenue-grows-yoy/

[12] *Id*. (Year: 2023; Quarter: All).

[13] *Id*. (Year: 2024; Quarter: All).

CLASS ACTION COMPLAINT

16.     Pig butchering scams follow a predictable pattern. The Financial Crimes Enforcement Network ("FinCEN") describes these scams as:

> The victims in this situation are referred to as "pigs" by the scammers who leverage fictitious identities, the guise of potential relationships, and elaborate storylines to "fatten up" the victim into believing they are in trusted partnerships. The scammers then refer to "butchering" or "slaughtering" the victim after victim assets are stolen, causing the victims financial and emotional harm. In many cases, the "butchering" phase involves convincing victims to invest in virtual currency, or in some cases, over-the-counter foreign exchange schemes—all with the intent of defrauding them of their investment.[14]

17.     The perpetrators of pig butchering scams are often brutal and sophisticated criminal syndicates, frequently located in Southeast Asia, and more recently around the world.[15] They target unsuspecting individuals looking for work, kidnap them, then force them to work on pig butchering scams in cramped conditions with limited food and water.[16] If these victims fail to meet their expectations, they are beaten, humiliated, electrocuted, and placed in solitary confinement; there have also been reports of organ removal, sexual assault, re-trafficking into the sex sector, and even punishment by death.[17] Studies estimate that hundreds of thousands of individuals throughout Myanmar and Cambodia are trafficked and forced to carry out these illegal scams.[18]

---

[14] *FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering"*, FINCEN ALERT (Sept.28, 2023), https://www.fincen.gov/sites/default/files/-shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf.

[15] United Nations, O*nline Scam Operations and Trafficking into Forced Criminality in Southeast Asia: Recommendations for a Human Rights Response*, UNITED NATIONS HUMAN RIGHTS, https://bangkok.ohchr.-org/sites/default/files/wp_files/2023/08/ONLINE-SCAM-OPERATIONS-2582023.pdf (last visited Jan. 7, 2025).

[16] *Id.* at 6, 14; *see also* Sui-Lee Wee, *They're Forced to Run Online Scams. Their Captors Are Untouchable*, THE NEW YORK TIMES (August 28, 2023), https://www.nytimes.com/2023-/08/28/world/asia/cambodia-cyber-scam.html; Isabelle Qian, *7 Months Inside an Online Labor Scam Camp*, THE NEW YORK TIMES (Dec. 17, 2023), https://www.nytimes.com/interactive/-2023/12/17/world/asia/myanmar-cyber-scam.html

[17] *Id.* at 14; *see also* Tara Siegel Bernard, *Lured by a Promising Job, He Was Forced to Scam People*, THE NEW YORK TIMES (Sep. 10, 2024), https://www.nytimes.com/2024/-09/10/business/scammers-trafficking-cybercrime.html.

18.    While online scams have a long history in Southeast Asia, these scam organizations rose to prominence through their illegal "casino and online gambling operations."[19] But the casinos were shut down when the pandemic hit, forcing the scam organizations to re-focus their attention on online fraud.[20]

19.    The timing could not have been better for these criminal syndicates. The pandemic forced individuals to isolate themselves and thus spend more time online. Many victims were lonely and seeking connections on dating apps, where they would stumble upon a profile displaying a lavish lifestyle.[21] These profiles look extremely realistic because the fraudsters utilize photos and videos stolen from data hacks and leaks.[22] Once the fraudster and victim match, the fraudsters use pre-written scripts designed to create emotional reactions and nurture the victim's dependence on the scam.[23] The fraudster will then introduce investing in some obscure crypto venture with the promises of extravagant returns, only for the victim to lose everything. Unfortunately, stories like these are all too common.[24]

---

[19] *Id.* at 6; *see also* Lily Hay Newman, Matt Burgess, *The Pig Butchering Invasion Has Begun*, WIRED (Sep. 30, 2024), https://www.wired.com/story/pig-butchering-scam-invasion/.

[19] *Id.* at 5.

[20] *Id.* at 6.

[21] *See, e.g.*, Kevin Roose, *Crypto Scammers' New Target: Dating Apps*, NEW YORK TIMES (February 21, 2022), https://www.nytimes.com/2022/02/21/technology/crypto-scammers-new-target-dating-apps.html.

[22] Isabelle Qian, *7 Months Inside an Online Labor Scam Camp*, THE NEW YORK TIMES (Dec. 17, 2023), https://www.nytimes.com/interactive/-2023/12/17/world/asia/myanmar-cyber-scam.html

[23] *Id.*; *see also How to Stay Safe When Having Conversations Online*, NATIONAL COUNCIL ON AGING (May 7, 2024), https://www.ncoa.org/article/how-to-stay-safe-when-having-conversations-online/.

[24] *Id.; see also* Emily Schamll, Retirees Are Losing Their Life Savings to Romance Scams. Here's What to Know, THE NEW YORK TIMES (Feb. 3, 2023), https://www.nytimes.com/-2023/02/03/business/retiree-romance-scams.html.

CLASS ACTION COMPLAINT

20.     The pandemic also coincided with the rise of crypto—many scam victims were interested in these potential returns. Fraudsters used targeted advertisements on Google, YouTube, Facebook, TikTok, etc., to connect with the crypto-curious. Many of the ads featured AI-generated celebrity endorsements, such as Steve Wozniak, Elon Musk, or Bill Gates.[25] The advertisements typically lead to a realistic or spoofed website or app, where information about the crypto venture could be found. Additional information about these supposed crypto ventures can be found though Google searches, which often display phony international business registrations. They are also frequently supported by fervent groups of supposed investors on social media sites like Facebook, Telegram, or Discord. In these groups, individuals share their success stories and give tips on how to best maximize their returns.

21.     Once a victim begins investing, they see immediate returns. But some victims remain skeptical; sophisticated scam enterprises allow the victims to withdraw their supposed earnings to win their trust, tricking them into investing even more. Victims invest hundreds, thousands, sometimes up to millions before they attempt to withdraw their money. But once a victim tries to withdraw a substantial portion of their supposed earnings, the fraudsters explain that a tax or fee must be paid. Many victims realize they have been scammed here, but some are so desperate they send additional money, only to realize they will not recover any of it.

22.     The aftermath is devastating. Victims often lose their life savings; some victims report their losses to be in the millions. Some victims are forced to declare bankruptcy or sell their home to finance their newly realized debt.[26]

---

[25] *See, e.g.*, Ethan Baron, *Apple co-founder Steve Wozniak wins latest round in lawsuit vs. YouTube over Bitcoin scam*, SEATTLE TIMES (March 21, 2024), https://www.seattletimes.com/-business/apple-co-founder-steve-wozniak-wins-latest-round-in-lawsuit-vs-youtube-over-bitcoin-scam/.

[26] *See, e.g.*, Jason Knowles, *Woman loses nearly $1 million life savings in 'pig butchering' scam*, ABC7 NEW YORK (September 9, 2024), https://abc7ny.com/post/woman-living-illinois-loses-1-million-life-savings-pig-butchering-scam-forced-sell-home-belongings/15271332/.

CLASS ACTION COMPLAINT

23.      The psychological effects are hidden, but equally real. Research confirms that victims suffer significant psychological impacts, including depressive symptoms, shame, embarrassment, shock, anger, guilt, and worry.[27] Other studies show that victimization can result in physical health problems.[28]

## II.    Coinbase is Required to Comply with Laws Designed to Prevent Financial Fraud like Pig Butchering.

24.      Federal and state legislatures have enacted laws and regulations designed to "prevent, detect, and prosecute. . . financial frauds that prey on law-abiding citizens." *See* USA Patriot Act of 2001, 107 P.L. 56, 115 Stat. 272, 296; *see also, e.g.*, Cal. Fin. Code § 2002.

25.      These laws require financial institutions to verify customer identity and establish procedures to report suspicious activity—commonly referred to as know your customer ("KYC") and anti-money laundering ("AML") procedures.

26.      These laws mandate that financial institutions implement "reasonable procedures" to verify the identity of their customers "to the extent reasonable and practicable." 31 USCA § 5318(l)(2). At a minimum, this must include the customer's "name, address, and other identifying information." *Id.*

27.      In certain circumstances, money services businesses must record and verify the identity of both parties to a transaction. 31 C.F.R. § 1022.312. This is triggered when, for example, the exchange of currency through a financial institution exceeds $10,000. *See* 31 C.F.R. § 1010.311. The verification and recording process should identify the account number and identification number: either a social security number, taxpayer identification number, passport number, alien identification card, or "other official document evidencing nationality or residence." *Id.*

---

[27] Jacqueline M. Drew, Julianne Webster, *The victimology of online fraud: A focus on romance fraud victimization*, THE JOURNAL OF ECONOMIC CRIMINOLOGY (March 2024), https://www.-sciencedirect.com/science/article/pii/S2949791424000058#bib9.

[28] Cassandra Cross, *'They're Very Lonely': Understanding the Fraud Victimisation of Seniors*, INTERNATIONAL JOURNAL FOR CRIME, JUSTICE, AND SOCIAL DEMOCRACY (Dec. 1, 2016), https://www.sciencedirect.com/science/article/pii/S2949791424000058#bib9.

28.     Money services businesses must also report suspicious activity. 31 C.F.R. § 1022.320. The reporting requirement is triggered when a transaction "involves or aggregates" at least $2,000 and the financial institution "has reason to suspect" the transaction:

> (iii) Serves no business or apparent lawful purpose, and the reporting money services business knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.
>
> (iv) Involves use of the money services business to facilitate criminal activity.[29]

29.     In September 2023, FinCEN issued a notice describing the mechanics of pig-butchering scams and reminding financial institutions of their obligation to report suspicious activity. The notice highlighted 15 red flags for institutions to monitor; several are especially relevant here:

> (1) A customer with no history or background of using, exchanging, or otherwise interacting with virtual currency attempts to exchange a high amount of fiat currency from an existing or newly opened bank account for virtual currency…
> …
>
> (4) A customer appears distressed or anxious to access funds to meet demands or the timeline of a virtual currency investment opportunity.
> …
>
> (7) A customer receives what appears to be a deposit of virtual currency from a virtual currency address at or slightly above the amount that the customer previously transferred out of their virtual currency account.  This deposit is then followed by outgoing transfers from the customer in substantially larger amounts.
>
> (8) Accounts with large balances that are inactive or have limited activity begin to show constant, uncharacteristic, sudden, abnormally frequent, or significant withdrawals of large amounts of money being transferred to a VASP or being exchanged for virtual currency.
> …
>
> (10) A customer with a short history of conducting several small-value EFTs to a VASP abruptly stops sending EFTs and begins sending multiple high-value wire transfers to accounts of holding companies, limited liability corporations, and individuals with which the customer has no prior transaction history.  This is indicative of a victim sending trial transactions to a scammer before committing to and sending larger amounts.
>
> (11) System monitoring and logs show that a customer's account is accessed repeatedly by unique IP addresses, device IDs, or geographies inconsistent with prior access patterns. Additionally, logins to a customer's online account at a

---

[29] 31 C.F.R. § 1022.320(a)(2).

CLASS ACTION COMPLAINT

VASP come from a variety of different device IDs and names inconsistent with the customer's typical logins.

30.     Coinbase acknowledges it is a "money services business" subject to these laws and is registered with FinCEN.[30] Coinbase also acknowledges that its services are "money transmission services" in many jurisdictions, thus requiring that Coinbase maintain a license in those jurisdictions.[31] Yet, Coinbase does not maintain a money transmission license in California, despite performing these services.[32]

31.     Accordingly, Coinbase is improperly providing unlicensed money transmission services in California.

## III.     Coinbase Voluntarily Adopted Contractual Terms Providing Greater Protection Than Those Mandated by State and Federal Law.

32.     When a Coinbase customer creates a Coinbase account, they must review and agree to the Coinbase User Agreement. This agreement applies to "coinbase.com, Coinbase's APIs, the Coinbase mobile application, or any other Coinbase website (collectively the "Coinbase Site")" and requires that the customer agree to Coinbase's "Prohibited Use Policy."[33]

33.     The Coinbase User Agreement acknowledges its legal obligations to verify customer identity and report suspicious activity. It also went further by offering additional protection to its customers. For example, the User Agreement states that Coinbase "will reverse" transactions it suspects "involve money laundering, terrorist financing, fraud, or any other type of financial crime; be erroneous; or relate to a Prohibited Use or a Prohibited Business as set forth in the Prohibited Use Policy."

34.     The Prohibited Use Policy forbids users from engaging in any of the following:

---

[30] Coinbase 10-K, *supra*, at 15.

[31] *Id*. at 15.

[32] *Licenses*, WWW.COINBASE.COM, https://www.coinbase.com/legal/licenses (last accessed January 29, 2025).

[33] *Coinbase User Agreement*, WWW.COINBASE.COM (last updated Feb. 25, 2025), https://-www.coinbase.com/legal/user_agreement/united_states (last accessed February 3, 2025).

**Unlawful Activity**: Activity which would violate, or assist in violation of, any law, statute, ordinance, regulation, or sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"), or which would involve proceeds of any unlawful activity; publishing, distributing or disseminating any unlawful material or information.

**Fraud**: Activity which operates to defraud Coinbase, Coinbase users, or any other person; provide any false, inaccurate, or misleading information to Coinbase.[34]

In addition, Coinbase's Prohibited Use Policy explicitly prohibits certain categories of businesses from using Coinbase services. This includes:

**Unfair, predatory or deceptive practices**: Investment opportunities or other services that promise high rewards; sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that we determine in our sole discretion to be unfair, deceptive, or predatory towards consumers.[35]

35. Coinbase also acknowledges that it is a "regulated financial service company" that must "remain in compliance with KYC/AML laws in the jurisdictions in which we operate" to continue operating.[36] Accordingly, Coinbase verifies customer identity and monitors transactions to "protect Coinbase and the community from fraudulent users…"[37]

36. Coinbase also "may cancel or refuse to process any pending Outbound Digital Asset Transfers as required by law" or might require its user "wait some amount of time after completion of a transaction before permitting you to use further Coinbase Services and/or before permitting you to engage in transactions beyond certain volume limits."[38]

---

[34] *Coinbase Prohibited & Conditional Use Policy*, WWW.COINBASE.COM (effective Jan. 31, 2022), https://www.coinbase.com/legal/prohibited_use.

[35] *Id.*

[36] Coinbase User Agreement, *supra*, at Appendix 1: Verification Procedures and Limits.

[37] *Id.*

[38] *Id.* at Sections 4 and 6, and Appendix 4.

11

37.    Coinbase Wallet ("Wallet") is a Coinbase mobile application and website, and so its use is governed by Coinbase's User Agreement.[39] In addition, Wallet's terms of service state that "[y]our relationship with any given Wallet provider is governed by the applicable terms of that Wallet provider, not these Terms."[40] If a user becomes aware of fraud on Wallet, they are directed to report it to Coinbase's main platform: https://help.coinbase.com.[41] And when a Wallet user links their Coinbase account, they are required to re-agree to Coinbase's User Agreement:



---

[39] Coinbase User Agreement, *supra.*

[40] *Coinbase Wallet Dapp Terms of Service*, WWW.WALLET.COINBASE.COM (last updated October 9, 2024), https://wallet.coinbase.com/dapp-terms-of-service.

[41]. *Coinbase Wallet Terms of Service*, WWW.WALLET.COINBASE.COM (last updated October 8, 2024), https://wallet.coinbase.com/terms-of-service.

38.     Wallet is a "self-custody wallet" that allows users to control and store a cryptocurrency's "private key" directly on the user's device.[42] Wallet allows users to establish a decentralized application ("Dapp") wallet and access a digital asset browser and link to decentralized exchanges ("DEXs"). Coinbase users can only use Dapp and access DEX's through the Wallet platform:



39.     Coinbase's User Agreement contains provisions relating to its "Dapp Wallet, DEXes, and Decentralized Applications"—*i.e.*, Coinbase Wallet.[43]  Coinbase reserves the right to "determine types of Digital Assets that will be supported or cease to be supported."[44]

40.     Coinbase further claims it "may cancel or refuse to process any pending Dapp Wallet Outbound Transfers as required by law or any court or other authority to which Coinbase is subject in any jurisdiction. Additionally, we may require you to wait some amount of time after

---

[42] *What's the difference between Coinbase.com and Coinbase Wallet,* https://help.coinbase.com/en-/wallet/getting-started/what-s-the-difference-between-coinbase-com-and-wallet (last accessed February 3, 2025).

[43] Coinbase User Agreement, *supra*.

[44] *Id.*

CLASS ACTION COMPLAINT

completion of a transaction before permitting you to use further Coinbase Services and/or before permitting you to engage in transactions beyond certain volume limits."[45]

## IV.    Coinbase Eschewed its Legal and Contractual Duties in Pursuit of Higher Profits.

41.    Coinbase fails to comply with its legal duty to verify accounts and report suspicious activity and thus fails to honor its contractual promise to combat fraud.

42.    In 2021, the New York State Department of Financial Services ("NYDFS") began an enforcement investigation into Coinbase's compliance with state and federal law.[46] The investigation concluded on January 4, 2023, with Coinbase agreeing to a $100 million settlement.[47] The results of the NYDFS investigation were unequivocal: Coinbase's inadequate KYC/AML procedures exposed "its platform to risk of exploitation by criminals and bad actors."[48]

43.    These failures were due, in part, to Coinbase's "dramatic and unexpected growth."[49] From January 2020 to May 2021, customer sign-ups increased by a multiple of 15; from January 2020 to November 2021, customer signups increased by a multiple of 25.[50] This exponential growth, paired with already "immature and inadequate" customer verification and suspicious activity reporting, "exacerbated" Coinbase's failures.[51]

---

[45] *Id.*

[46] Consent Order, *In the Matter of Coinbase, Inc.*, at 2. Available at: https://www.dfs.ny.gov/industry_guidance/-enforcement_actions.

[47] *Id.* at 22-23.

[48] *Id.* at 3.

[49] *Id.* at 2.

[50] *Id.* at 6.

[51] *Id.* at 13.

CLASS ACTION COMPLAINT

44.     According to the investigators, Coinbase treated its customer verification requirements "as a simple check-the-box exercise."[52] It also failed to conduct "enhanced due diligence" on high-risk customers.[53] The NYDFS reports that, as of July 2022, "there were over 10,000 cases in the backlog for Coinbase and its affiliates" for such high-risk customers.[54] Coinbase asked for minimal documentation from these customers, conducted "only a cursory review of the material provided," and accepted incomplete responses.[55] Moreover, the investigators claimed that Coinbase had *still* not "rationally" assigned risk ratings on accounts opened before December 2020.[56]

45.     As a result of this failure, suspicious activity frequently went unrecognized. For example, the NYDFS's investigation identified a Coinbase user charged with crimes related to child pornography engaging in suspicious transactions "potentially associated with illicit activity without detection from Coinbase."[57]

46.     Coinbase failed to employ an "adequate compliance staff" leading to a backlog of over 100,000 unreviewed monitoring alerts by the end of 2021.[58] Coinbase attempted to "burn through" this backlog by hiring over one thousand third-party contractors.[59] But, in line with its past actions, Coinbase failed to provide sufficient oversight.[60] By May 2022, Coinbase retained another third-party audit firm to quality check the backlog—the results were alarming. "[M]ore

---

[52] *Id.*

[53] *Id.* at 5, 8, 13.

[54] *Id.* at 14.

[55] *Id.*

[56] *Id.*

[57] *Id.* at 15.

[58] *Id.* at 16-17.

[59] *Id.*

[60] *Id.*

than half" of the sampled contractors failed the quality test.[61] One contractor's failure rate was 96%, while another contractor's failure rate was 73%.[62] And at the time the consent order was entered, the NYDFS admitted that "the full extent of activity that was contained in Coinbase's [transaction monitoring system] has not been fully determined…"[63]

47.    Accordingly, the investigation concluded that "Coinbase face[s] an increased risk of abuse by bad actors." And these risks have real world consequences; the NYFDS stated that:

> [T]he Department has identified troubling examples of suspicious conduct that **should have been identified, stopped, and (in some instances) reported to authorities** but was not, at least initially, due to the backlog. This includes, among other things, examples of possible money laundering, suspected CSAM-related activity, and potential narcotics trafficking.[64]

48.    Because of this backlog, Coinbase failed to file suspicious activity reports as required by federal law. The NYDFS "found numerous examples of SARs filed months, some more than six months, after the suspicious activity was first known to Coinbase."[65]

49.    These failures are not accidental—Coinbase's profits are directly tied to "trading activity" on its platform.[66] Coinbase thus made a calculated choice to ease the process of opening accounts to maximize its revenues.

50.    Coinbase is fully aware of the threats that scams pose to unsuspecting Coinbase users. On its website, it acknowledges that studies show consumers globally lose over $1 trillion

---

[61] *Id*. at 17.

[62] *Id*. at 17-18.

[63] *Id*.

[64] *Id*.

[65] *Id*. at 19.

[66] Coinbase 10-K, *supra*, at 92.

to financial scams.[67] It goes on to explain the common types of scams, including pig butchering, on several pages and explains how "consumers can protect themselves."[68]

51.    The top payment method for imposter and investment scams was either crypto currency or "payment apps" in 2024.[69]

52.    As a result of its lax customer verification and fraud prevention procedures, Coinbase can process more transactions, directly translating to higher profits. And it reaps substantial profits. According to its most recent annual report, it earned $2.6 billion in profits in 2024.[70] Revenue from transaction fees is its primary source of revenue—bringing in $3.9 billion in total, with $3.4 coming from consumers.[71]

53.    Coinbase charges fees when a user purchases cryptocurrency on its platform, and it admits that "trading activity directly impacts transaction revenue[.]"[72] The fees are "calculated at the time you place your order and can be influenced by factors such as your chosen payment method, order size, market conditions, jurisdictional location, asset, and other costs we incur to facilitate your transaction."[73]

---

[67] *Detecting and Avoiding Scams*, https://www.coinbase.com/public-policy/advocacy/documents-/detecting-and-avoiding-scams (last accessed February 3, 2025).

[68] *Id*.; *see also Investment Scams*, https://help.coinbase.com/en/coinbase/privacy-and-security/avoid-scams/investment-scams (last accessed February 3, 2025).

[69] *Fraud Facts*, FTC CONSUMER SENTINEL NETWORK (Fraud Category: Imposter Scams; Year: 2024; Quarter: All), https://public.tableau.com/app/profile/federal.trade.commission/viz/-FraudReports/FraudFacts (last updated November 8, 2024).

[70] Coinbase, 10-K, *supra*, at 93.

[71] *Id*. at 94.

[72] *Id*. at 93.

[73] *Coinbase Pricing and Fee Disclosures*, https://help.coinbase.com/en/coinbase/trading-and-funding/pricing-and-fees/fees (last accessed February 3, 2025).

CLASS ACTION COMPLAINT

**V.     Coinbase Fails to Provide Adequate Customer Support.**

54.     Coinbase does not provide its users with a reasonable mechanism to contact the company to report fraud or other illicit activity. The Coinbase website claims it provides help through its "support team by phone or messaging," but there is no phone number listed on its website.[74] Hidden in the Coinbase User Agreement, however, is a phone number that customers in need of assistance can call—(888) 908-7930. [75] But that phone number only allows users to listen to a pre-recorded message redirecting the user back to the Coinbase website. The phone number does not allow the caller to leave a message.

55.     The Coinbase help website is also inadequate. It requires customers to describe their problems in a search box, which at times generates an AI response; other times, it simply redirects the customer to unhelpful articles:

> ⓘ  Exploring crypto again? Check out our **Returning Customer Resource Guide.**

> 🔍  I think I fell victim to a fraud                                        ✕

> If you believe you have fallen victim to a fraud, here are some steps to take:
>
> 1. **Secure Your Accounts:** Immediately change the passwords for your Coinbase account and any other online accounts that may have been compromised.
>
> 2. **Report the Fraud:** Contact Coinbase Support to report the fraudulent activity. Provide as much detail as possible about the incident.
>
> 3. **Monitor Your Accounts:** Closely monitor your Coinbase and other financial accounts for any unauthorized activity. Report any suspicious transactions to your bank and Coinbase.
>
> 4. **Consider Identity Theft Protection:** Enroll in an identity theft protection service to monitor your credit and personal information for any misuse.
>
> 📄 SOURCE ARTICLE
> **Fraud and suspicious activity**
> Read more ↗

---

[74] *Coinbase Security*, https://www.coinbase.com/security (last accessed February 3, 2025).

[75] *Coinbase User Agreement*, https://www.coinbase.com/legal/user_agreement/united_states (last accessed February 3, 2025).

CLASS ACTION COMPLAINT

56.    In some instances, the search bar allows the user to chat with the Coinbase Virtual Assistant, but this is equally ineffective. The Virtual Assistant is frequently "experiencing higher than normal wait times" and is unable to connect the user to an agent. And to make matters worse, the Virtual Assistant will unilaterally close the chat:




57.    Coinbase's inadequate customer support system delays and makes it difficult for victims of fraud to report their situation.

**VI.    To Win Consumers Over, Coinbase Represents Itself as "Safe" and "Secure."**

58.    Studies consistently find that "trust" and "security" are the top concerns consumers have when deciding whether they should adopt a new financial technology ("FinTech").[76] Other studies suggest "robust regulation" helps FinTech companies because it fosters public trust.[77] That is because consumers are consistently concerned that the "pace of

---

[76] *See, e.g.*, Global FinTech Adoption Index 2019, EY, available at https://x.fintechamericas-.co/ey-global-fintech-adoption-index-report; *see also* Taewoo Roh, Young Soo Yang, Shufeng Xiao, & Byung Il Park, *What Makes Consumers Trust and Adopt Fintech? An Empirical Investigation in China*, SPRINGER NATURE LINK (January 26, 2022), https://link.springer.com-/article/10.1007/s10660-021-09527-3.

CLASS ACTION COMPLAINT

technology is too fast."[78] Unfortunately, the concerns of these consumers have been proven well-founded, given that pig butchering scams have increased dramatically since the rise of digital payment apps.

59.    To capitalize on consumer desire for safety and security, Coinbase represents itself as a "the most trusted place for people and businesses to buy, sell, and use crypto" on its homepage.[79] On its security page, it touts that it is a public company required to "operate with more financial transparency" and that it uses "state-of-the-art encryption and security."[80]

60.    Coinbase continues to represent itself as a "trusted" and "secure" platform to convince consumers to use its platform. However, Coinbase users are unaware of the significant risks that come with using the Coinbase platform.

**PLAINTIFF'S EXPERIENCES**

61.    On or about August 22, 2022, Plaintiff Brian Carolus connected with a woman who went by "Snow" on the LINE messaging app—her full alias was "Chen Xuejie." She told Plaintiff she was originally from China, that she worked in fashion, and had recently relocated to San Francisco from Los Angeles. Her profile seemed genuine—she had several photos, and Plaintiff was able to locate her on other sites. She also sent him pictures and videos of herself that were not on her profile.

62.    Plaintiff and Snow talked extensively over the first few days. She gathered information about his job, family, friends, interests, and aspirations. She also hinted at her own

---

[77] Johan Ariff Jafri, Syajarul Imna Mohd Amin, Aisyah Abdul Rahman, & Shifa Mohd Nor, *A systematic literature review of the role of trust and security on Fintech adoption in banking*, SCIENCE DIRECT (January 15, 2024), https://www.sciencedirect.com/science/article/pii/S-2405844023101885#:~:text=The%20escalation%20of%20cyberattacks%20and,18%2C19%2C 20%5D.

[78] *Why Consumers Just Don't Trust Fintechs*, EDELMAN (Aug. 26, 2020), https://www.-edelman.co.uk/why-consumers-just-dont-trust-fintechs.
[79] *Coinbase Home*, https://www.coinbase.com/ (last accessed Jan. 30, 2025).

[80] *Coinbase Security*, https://www.coinbase.com/security (last accessed Feb. 3, 2025).

financial success and connections early on—ultimately claiming that her uncle was a successful crypto trader on Wall Street.

63.    After gaining Plaintiff's trust, Snow began shifting the conversation more towards her investments. She described a crypto-mining operation, Tetherpool.pro ("Tetherpool"), which she discovered from her uncle that promised substantial returns. Eventually, Snow shared a photo of her supposed Tetherpool account, which revealed a balance in the millions. She assured Plaintiff that he could see the same returns if he followed her instructions.

64.    Plaintiff inquired more. She explained that everything took place on the Coinbase platform. Plaintiff understood Coinbase was a publicly traded U.S. company subject to strict financial regulation and oversight. He also saw Coinbase advertisements touting its security, including Coinbase's homepage that claimed it was "the most trusted place… to buy, sell, and use crypto." The fact that Snow's crypto investment went through Coinbase only strengthened Plaintiff's belief that the investment was legitimate.

65.    Thus, Plaintiff tentatively agreed to initially invest 4,843.91 USDT. On or about August 30, 2022, Snow walked him through the entire process of transferring funds into Tetherpool. Plaintiff already had a Coinbase account, so the first step was to open a Coinbase Wallet. He did so and agreed to the terms of service. Then, he wired money from his bank account into his Coinbase account. Once the wire transfer was completed, he used those funds to purchase Tether—a form of cryptocurrency. He then transferred the Tether from his Coinbase Account to his Coinbase Wallet account.

66.    Finally, he navigated to the Tetherpool website through the Coinbase Wallet browser feature. Snow then proceeded to instruct Plaintiff about how to trade contracts using the Tetherpool platform and how much to invest into Tetherpool through the Coinbase Wallet application:




67.     As promised, his initial investment grew substantially. Snow explained to Plaintiff that Tetherpool provided higher returns on contracts that utilized larger amounts, so she recommended that he invest larger amounts. Plaintiff took that advice, ultimately investing approximately $110,000 over a period of several months.

68.     Coinbase charged a fee when Plaintiff (1) purchased Tether on his Coinbase account, (2) transferred Tether from his Coinbase account to his Coinbase Wallet, and (3) transferred Tether from his Coinbase Wallet to the Tetherpool website through the Coinbase Wallet browser.

CLASS ACTION COMPLAINT

69.     By early November 2022, Plaintiff's investments grew to nearly $500,000. On November 6, 2022, he attempted to make a withdrawal, but Tetherpool customer service representatives advised him that they froze his Tetherpool account and that he could not withdraw his earnings until he paid an immediate and substantial tax. Understanding that no such tax exists, Plaintiff sought help from Snow who refused to provide help and instead pressured him to try borrowing money from friends to pay the fraudulent tax.

70.     He tried to contact Coinbase with little luck. He contacted the Coinbase AI Virtual Assistant, but it failed to offer any substantive help. He also spoke to a Coinbase Support representative and was equally unsuccessful, being told that Coinbase could provide no assistance in resolving the issue or recovering the defrauded funds, and that Plaintiff should inform law enforcement.

71.     Moreover, on Plaintiff's investigation, he was unable to find Tetherpool through Google or any other search engine. The only place where he could access Tetherpool was through the Coinbase Wallet, which Snow had specifically instructed at the start he needed to download and use in order to access Tetherpool.

72.     Plaintiff then filed reports with the Federal Bureau of Investigation, the Securities and Exchange Commission, and the Federal Trade Commission. He also contacted a non-profit and a district attorney he thought might be able to help.

73.     But no one could help. The FBI informed him that ***they would not even begin to investigate*** claims involving less than $1 million.

## CLASS ALLEGATIONS

74.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals (the "Class"), defined as follows:

> **Nationwide Class**
> All persons in the United States who, during the applicable statutory period, bought or transferred cryptocurrency on the Coinbase platform, or the Coinbase Wallet website or application.

75.     Excluded from the Class are any of Defendant's officers, directors, or employees; officers, directors, or employees of any entity in which Defendant currently has or has had a controlling interest; and Defendant's legal representatives, heirs, successors, and assigns.

76.     Currently, Plaintiff does not know the exact number of Class Members; however, given the nature of the claims and the number of Coinbase users, Plaintiff believes that the Class Members are so numerous that joinder of all members is impracticable. Moreover, FTC published that it received over 681,000 reports of imposter or investment related scams in the first three quarters of 2024 alone.[81]

77.     There are questions of law and fact common to the class that predominate over questions solely affecting individual members. The following questions of law and fact are common to the Class Members and predominate over questions that may affect individual Class Members, such as:

a.     Whether Coinbase failed to comply with KYC, AML, and other applicable laws requiring it implement reasonable customer verification and suspicious activity reporting procedures;

b.     Whether Coinbase's customer verification and suspicious activity reporting procedures complied with industry standards;

c.     Whether Coinbase's User Agreement and Prohibited Use Policy constitutes an enforceable contract;

d.     Whether Coinbase breached the promises contained in the User Agreement and Prohibited Use Policy;

e.     Whether Coinbase users suffered damages as a result of Coinbase's breach of contract;

f.     Whether Coinbase's failure to comply with the applicable laws constituted an unfair and/or unlawful trade practice;

g.     Whether Coinbase participated in and pursued the common course of conduct complained of herein;

h.     Whether Coinbase was unjustly enriched as a result of the unlawful, and/or unfair conduct alleged in this Complaint such that it would be inequitable for Coinbase to retain the benefits conferred upon it by Plaintiffs and the other Class Members; and

---

[81] The Big View: All Sentinel Reports, *supra*, https://public.tableau.com/app/profile/federal.-trade.commission/viz/TheBigViewAllSentinelReports/TopReports (Year: 2024; Quarter: All).

i.   Whether Plaintiff and Class Members are entitled to restitution, monetary damages, and if so, what is the measure of the relief.

78.   Plaintiff's claims are typical of those of the Class because Plaintiff, like all Class Members, transferred money on Coinbase in a typical consumer setting and suffered harm from Coinbase's wrongful conduct.

79.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions. Plaintiff has no interests that conflict with those of the Class.

80.   The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Coinbase has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole. Coinbase's conduct is generally applicable to the Class as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole. As such, Coinbase's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

81.   The litigation of separate actions by Class Members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Coinbase.

82.   The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

83.   Plaintiff and other Class Members have suffered losses as a result of Coinbase's unlawful and wrongful conduct. Absent a class action, Coinbase will retain substantial funds received as a result of its wrongdoing, and such unlawful and improper conduct shall, in large measure, not go remedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Coinbase will be allowed to continue such conduct with impunity and retain the proceeds of its ill-gotten gains.

CLASS ACTION COMPLAINT

1

2

**COUNT I**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. Prof. Code. § 17200,** *et seq.,*
(On Behalf of Plaintiff and the Nationwide Class and Scam Subclass)

3       84.      Plaintiff fully incorporates by reference all the above paragraphs, as though fully

4   set forth herein.

5       85.      By failing to implement reasonable customer verification and suspicious activity

6   reporting procedures, along with the other allegations herein, Coinbase has violated California's

7   Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the Class as a

8   whole, by engaging in unlawful, fraudulent, and unfair conduct.

9       86.      Coinbase has violated the UCL's proscription against engaging in unlawful

10  conduct as a result of:

11          a.   violations of the Bank Secrecy Act. 31 USCA § 5311 *et seq.*

12          b.   violations of state law equivalents, such as the California Money Transmission
             Act. *See, e.g.*, Cal. Fin. Code § 2000 *et seq.*

13

14      87.      Coinbase, through its traditional Coinbase platform and its Coinbase Wallet, has

15  failed to implement reasonable customer verification or reporting procedures as required by these

16  statutes. *See* 31 USCA § 5318(l)(2); *see also* 31 CFR § 1022.320. The NYDFS confirmed that

17  Coinbase lacks sufficient verification and reporting procedures in place to comply with state and

18  federal law.

19      88.      Coinbase's failure to comply with these laws also violates the UCL's proscription

20  against unfair conduct. Coinbase is legally required to establish customer verification procedures

21  and monitor suspicious activity. Its failure to comply foreseeably leads to the festering of pig

22  butchering scams on its platform. Such a failure is against public policy, and is immoral,

23  oppressive, unscrupulous, and substantially injures consumers. This is especially true given that

24  Coinbase recognizes the dangers of pig butchering scams.

25      89.      Moreover, Coinbase went further by promising consumers it prohibits fraud on

26  its platform and will comply with state and federal money transmission laws that mandate

27

28

**CLASS ACTION COMPLAINT**

reporting and sometimes halting suspicious payments. Coinbase has failed to live up to these promises.

90.     And finally, Coinbase failed to provide its users with an adequate support system. The phone number is not easily accessible, and even if a user finds it, it leads back to the Coinbase Virtual Assistant. The Virtual Assistant frequently fails to offer users the necessary help, aside from sometimes beginning a virtual chat with a representative. But the virtual representatives are overwhelmed and under responsive, and Coinbase's Virtual Assistant can unilaterally end the request.

91.     As a result, Plaintiff and Class Members have suffered injury in fact and have lost money or property as a result of Coinbase's violation of these statutes. Plaintiff and Class Members would not have used Coinbase had they known it is not a safe and secure platform, or that it fails to comply with basic legal obligations. Alternatively, Plaintiff would have paid less for Coinbase's services.

92.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class seek an order of this Court that includes, but is not limited to, an order requiring Coinbase to:

    a.  provide restitution to Plaintiff and the other Class Members;

    b.  disgorge all revenues obtained as a result of violations of the UCL;

    c.  implement reasonable and compliant customer verification and reporting procedures; and

    d.  pay Plaintiff's and the Class's attorney fees and costs.

**<u>COUNT II</u>**
**BREACH OF CONTRACT**
(On Behalf of the Plaintiff and the Nationwide Class and Scam Subclass)

93.     Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

94.     Coinbase's relationship with its users is governed by the Coinbase User Agreement, which incorporates and/or should be construed consistent with its Prohibited Use

Policy. The Coinbase User Agreement also governs users' use of Coinbase's Wallet application/website.

95.    The Prohibited Use Policy promises to Plaintiff and Class members that Coinbase does not allow "[u]nfair, predatory, or deceptive practices" including "investment opportunities… that promise high rewards." In addition, the Prohibited Use Policy forbids users from engaging in "unlawful activity" and "fraud," and bars "[u]nfair, predatory or deceptive practices" from its platforms.

96.    Coinbase promises that it "will reverse" transactions if it "suspect[s] the transaction may: involve money laundering, terrorist financing, fraud, or any other type of financial crime; be erroneous; or relate to a Prohibited Use or a Prohibited Business as set forth in the Prohibited Use Policy."

97.    Coinbase's User Agreement also promises that it will "remain in compliance with KYC/AML laws in the jurisdictions in which we operate" and "protect Coinbase and the community from fraudulent users…"

98.    Coinbase has breached these promises.

99.    Plaintiff and Class Members have fulfilled their obligations under the relevant contracts and are not in breach of any.

100.    As a result of Coinbase's breach(es), Coinbase was able to obtain the personal property of Plaintiff and the Class Members and earn unjust profits.

101.    Plaintiff and Class Members also did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration by paying fees to Coinbase, which has ascertainable value to be proven at trial.

102.    Plaintiff and Scam Subclass Members have also suffered foreseeable consequential damages as a result of Coinbase's breach(es).

103.    Plaintiff, on behalf of himself and Class Members, seek compensatory damages, consequential damages, and/or restitutionary disgorgement in an amount to be proven at trial and declarative injunctive or other equitable relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Nationwide Class and Scam Subclass)

104.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

105.    Plaintiff and the Class conferred benefits on Coinbase by using Coinbase's platform and paying it fees.

106.    Coinbase has knowledge of such benefits and voluntarily accepts and retains these benefits.

107.    Coinbase has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Class's use of the Coinbase platform.

108.    Retention of that money under these circumstances is unjust and inequitable because Coinbase failed to comply with basic legal requirements, as alleged throughout. At the same time, Coinbase represented its platform as "safe" and "secure," when it is neither.

109.    These failures and misrepresentations caused injuries to Plaintiff and the Nationwide Class because they would not have used the Coinbase platform, or they would have not paid as much for Coinbase's services had they known of Coinbase's failures.

110.    Because Coinbase's retention of the non-gratuitous benefits conferred to it by Plaintiffs and the National Class is unjust and inequitable, Defendant ought to pay restitution to Plaintiffs and the Class for its unjust enrichment.

## PRAYER FOR RELIEF

Wherefore Plaintiff, individually and on behalf of all Class Members and all others similarly situated, prays for relief as follows relating to her collective, class and representative action allegations:

1.    An order certifying the proposed Nationwide Class and Scan Subclass; appointing Plaintiff as representative of such Classes; and appointing Plaintiffs' undersigned counsel as Class counsel for the Nationwide Class and Scan Subclass;

2.    That the Court award Plaintiff, the Nationwide Class, and the Scam Subclass, restitutionary disgorgement, actual damages, and consequential damages, in an amount to be determined at trial;

3.    That the Court award Plaintiff and Class Members pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

4.    That the Court issue the equitable relief against Defendant to Plaintiffs and Class Members are entitled;

5.    That the Court award any and all other such relief as the Court may deem just and proper under the circumstances; and

6.    A declaration that Coinbase is financially responsible for notifying Class Members of the pendency of this suit.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all claims so triable.

Dated: April 4, 2025

**STEPHAN ZOURAS LLC**
**NICHOLS KASTER, LLP**

By:      s/    *Matthew C. Helland*
Matthew C. Helland

Attorneys for Plaintiff the Proposed Nationwide Class and Scam Subclass

31

CLASS ACTION COMPLAINT