1  James B. Zouras, *pro hac vice*
   jzouras@stephanzouras.com
2  Ryan F. Stephan, *pro hac vice*
   rstephan@stephanzouras.com
3  Justin M. Caparco, *pro hac vice*
   jcaparco@stephanzouras.com
4  **STEPHAN ZOURAS, LLC**
   222 West Adams Street, Suite 2020
5  Chicago, Illinois 60606
   Phone: 312-233-1550
6
   Matthew C. Helland, State Bar No. 250451
7  helland@nka.com
   **NICHOLS KASTER, LLP**
8  235 Montgomery Street, Ste. 810
   San Francisco, CA 94104
9  Telephone: (415) 277-7235

10 *Attorneys for Plaintiff and the Proposed Class*

11                  **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| BRIAN CAROLUS, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-03089-CRB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** |
| v. | Date         August 29, 2025<br>Time         10:00 a.m.<br>Judge:       Honorable Charles R. Breyer<br>Location:    Courtroom 6, 17th Floor |
| COINBASE GLOBAL, INC., COINBASE INC., AND COINBASE BERMUDA SERVICES LIMITED, | |
| Defendant. | |

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................................. 1

II. BACKGROUND ................................................................................................................... 1

    A. DESPITE PLAINTIFF'S LIFE-ALTERING LOSSES—ENABLED BY COINBASE—HE COULD NOT RETAIN COUNSEL ON AN INDIVIDUAL BASIS. .................................................................. 1

    B. COINBASE'S ONE-SIDED ARBITRATION AGREEMENT. ........................................................ 2

III. ARGUMENT ........................................................................................................................ 3

    A. THE *DISCOVER BANK* RULE RENDERS COINBASE'S ARBITRATION AGREEMENT UNCONSCIONABLE. ............................................................................................................ 4

        1. The Discover Bank rule is only preempted as applied to bilateral arbitration. ................. 4

        2. Unconscionability is assessed at contract formation—without reference to "post-contract formation circumstances." ................................................................... 6

        3. Plaintiff's losses are not too high to invoke the Discover Bank rule. ............................. 7

            i. The relevant inquiry is whether Plaintiff alleged predictably small losses at the time of contracting. .................................................................. 7

            ii. Even considering Plaintiff's losses, individual enforcement remains impractical. ..................................................................................... 8

    B. EVEN IF CALIFORNIA'S *DISCOVER BANK* RULE DOES NOT APPLY, COINBASE'S DELEGATION AND ARBITRATION CLAUSES ARE UNCONSCIONABLE. .................................................... 9

        1. The arbitration agreement and the delegation clause are procedurally unconscionable. ................................................................................................................ 10

        2. Coinbase's arbitration agreement and the delegation clause contain a significant degree of substantive unconscionability ...................................................... 11

            i. Coinbase's group arbitration binds absent parties without due process. ............... 11

            ii. The arbitration agreement is illusory. .................................................................... 13

            iii. The User Agreement impermissibly shifts arbitration-related fees onto Plaintiff. ..... 14

    C. SEVERANCE IS IMPROPER HERE BECAUSE THE ARBITRATION AGREEMENT IS PERMEATED WITH UNCONSCIONABILITY. ........................................................................ 15

IV. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Armendariz v. Foundation Health Psychare Services, Inc.*,
  6 P.3d 669, 690 (Cal. 2000) .................................................................................. 9, 14, 15

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333, 344 (2011) .................................................................................................. passim

*Bernstein v. Coinbase Global Inc.*,
  No. 1:25-cv-05313, Dkt. 1 ¶¶ 51–61 (N.D. Ill. May 13, 2025) ......................................... 3, 7, 14

*Bielski v. Coinbase, Inc.*,
  87 F.4th 1003, 1014 (9th Cir. 2023) ................................................................................ passim

*Brashear v. Halliburton Energy Servs.*, Inc.,
  No. 1:20-cv-0505-NON JLT, 2020 WL 4596116, at *14 (E.D. Cal. Aug. 11, 2020) ............... 13

*Brennan v. Opus Bank*,
  796 F.3d 1125, 1132 (9th Cir. 2015) ..................................................................................... 9

*Cohen v. DirectTV*,
  142 Cal. App. 4th 1442, 1452 (2006) .................................................................................... 8

*Discover Bank v. Superior Ct.*,
  113 P.3d 1100, 1105 (Cal. 2005) .................................................................................. passim

*Douglas v. U.S. Dist. Court for the Cent. Dist. of Cal.*,
  495 F. 3d 1062, 1068 (9th Cir. 2007) .................................................................................... 8

*Dumais v. American Golf Corp.*,
  299 F.3d 1216, 1219-20 (10th Cir. 2002) ............................................................................. 13

*Floss v. Ryan's Family Steak Houses, Inc.*,
  211 F.3d 306, 315-16 (6th Cir. 2000) ................................................................................... 13

*Gibson v. Neighborhood Health Clinics, Inc.*,
  121 F.3d 1126, 1133 (7th Cir. 1997) .................................................................................... 13

*Grand Prospect Partners v. Ross Dress for Less, Inc.*,
  232 Cal. App. 4th 1332, 1347 (2015) .................................................................................. 10

*Heckman v. Live Nation Ent., Inc.*,
  686 F. Supp. 3d 939, 963 (C.D. Cal. 2023)) ........................................................................ 13

*Heckman v. Live Nation Ent., Inc.*,
  120 F.4th 670, 689 (9th Cir. 2024) ................................................................................ passim

*Hodges v. Comcast Cable Communications, LLC,*
  21 F.4th 535, 543 (9th Cir. 2021) .......................................................................................... 4

*Indep. Ass'n of Mailbox Ctr. Owners, Inc. v. Superior Court*,
  133 Cal. App. 4th 396, 408-411 (2005) ................................................................................. 8

*Ingle v. Circuit City Stores, Inc.*,
328 F.3d 1165, 1179 (9th Cir. 2003) ........ 13, 14

*Kohler v. Whaleco, Inc.*,
757 F. Supp. 3d 1112 (S.D. Cal. 2024) ........ 6

*Lhotka v. Geographic Expeditions, Inc.*,
181 Cal. App. 4th 816, 826 (2010) ........ 15

*Lim v. TForce Logistics, LLC*,
8 F.4th 992, 1000 (9th Cir. 2021) ........ 11

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022) ........ 7

*Massie v. Ralphs Grocery Co.*,
No. B224196, 2012 WL 1078562, at * 6 (April 2, 2012 Cal. Ct. App.) ........ 8

*Oestreicher v. Alienware Corp.*,
322 F. App'x 489, 492 (9th Cir. 2009) ........ 4, 8

*Omstead v. Dell, Inc.*,
594 F.3d 1081, 1086 (9th Cir. 2010) ........ 4, 8

*Oto, LLC v. Koh*,
447 P.3d 680, 691 (Cal. 2019) ........ 10

*Pandolfi v. AviaGames, Inc.*,
2024 WL 3558853, at *4 (N.D. Cal. July 26, 2024) ........ 7

*Patterson v. ITT Consumer Fin. Corp.*,
14 Cal. App. 4th 1659, 1664 (Ct. App. 1993) ........ 10

*Phillips Petrol. Co. v. Shutts*,
472 U.S. 797, 812 (1985) ........ 12

*Pinela v. Neiman Marcus Grp., Inc.*,
238 Cal. App. 4th 227, 254–55 (2015) ........ 15

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
282 P.3d 1217, 1232 (2012) ........ 10, 11

*Provencher v. Dell, Inc.*,
409 F. Supp. 2d 1196, 1202-4 (C.D. Cal. 2006) ........ 8

*Ramirez v. Charter Communications, Inc.*,
551 P.3d 520, 539 (Cal. 2024) ........ 6, 7, 14, 15

*Sanchez v. Valencia Holding Co.*,
353 P.3d 741, 748 (Cal. 2015) ........ 9

*Shroyer v. New Cingular Wireless Servs., Inc.*,
498 F.3d 976, 983 (9th Cir. 2007) ........ 4

*Vasquez v. Superior Court*,
  484 P.2d 964 (Cal. 1971) .................................................................................................. 4

*Viking River Cruises, Inc. v. Moriana*,
  596 U.S. 639, 656 (2022) .............................................................................................. 4, 5

*Wallrich v. Samsung Elecs. Am., Inc.*,
  106 F.4th 609, 620 (7th Cir. 2024) .................................................................................. 14

*Yeng Sue Chow v. Levi Strauss & Co.*,
  49 Cal. App. 3d 315, 325 (Ct. App. 1975) ........................................................................ 6

**Statutes and Rules**

AAA's Mass Arbitration Supplementary Rules ..................................................................... passim

Cal. Civ. Code § 1670.5 ................................................................................................................ 15

Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. ..................................................................... 1, 5, 6, 9

**Other Sources**

Myriam E. Gilles, *Arbitration's Unraveling*, 172 U. Pa. L. Rev. 1063 (2024) ............................... 3

Richard Frankel, *Fighting Mass Arbitration: An Empirical Study of the Corporate Response to Mass Arbitration and Its Implications for the Federal Arbitration Act*,
  78 Vanderbilt L. Rev. 133 (2025) ...................................................................................... 3

## I. INTRODUCTION

Coinbase's motion is outdated. It ignores the Ninth Circuit's recent decision in *Heckman v. Live Nation*; controlling precedent holding that once a company shifts from bilateral arbitration to mass procedures—like Coinbase did—it forfeits the protections of the Federal Arbitration Act ("FAA"). 120 F.4th 670, 689 (9th Cir. 2024). *Heckman* revived the *Discover Bank* rule, which renders class waivers in adhesive, small-value contracts unconscionable. Coinbase ignores *Heckman* entirely, relying instead on outdated case law—because it knows this binding precedent leads to an obvious result: the agreement is unconscionable under California law.

This was Coinbase's choice. It could have preserved bilateral arbitration and the protections of the FAA. But faced with a potential surge of individual arbitration demands—and the steep costs that come with them—it opted for a system that mirrors class litigation without the safeguards. Now, having abandoned the core features the FAA was designed to protect, Coinbase seeks to enforce a class waiver as if nothing has changed. Its request ignores both the facts and the law.

But even setting *Discover Bank* aside, Coinbase's agreement fails under established unconscionability principles. It is a quintessential contract of adhesion and therefore oppressive. *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1014 (9th Cir. 2023) (finding that "Coinbase's delegation provision contains some level of procedural unconscionability."). And it is riddled with one-sided provisions: mass procedures that bind non-parties without notice, a mechanism that allows Coinbase to unilaterally terminate the arbitration agreement, and penalty provisions that discourage consumers from challenging its enforceability. For these and the reasons that follow, the Court should deny Coinbase's motion.

## II. BACKGROUND

**A. Despite Plaintiff's life-altering losses—enabled by Coinbase—he could not retain counsel on an individual basis.**

Plaintiff Brian Carolus lost over $100,000 in a cryptocurrency scam that operated entirely through Coinbase's platform. Dkt. 1 ("Compl."), ¶ 67. Every step of the fraud—from the initial wire transfer to the purchase and transfer of cryptocurrency—took place on the Coinbase platform. *Id*. ¶¶ 64-68. Carolus even accessed the fraudulent investment platform using Coinbase's in-app browser. Coinbase's policies and regulatory obligations require it to detect and prevent suspicious

1  activity, but it failed to act despite clear red flags. Meanwhile, it profited from the scam in small
2  increments—siphoning off 0.5% to 1% of each transfer. *Id*. ¶¶ 53.

3        For Carolus—a paralegal earning a modest income—his losses were devastating. He spent
4  years searching for legal representation, but given the complexity of his claims—implicating
5  cryptocurrency tracing, regulatory duties, and uncertain damage calculations—no attorney would
6  take the case on a contingency basis. Declaration of Brian Carolus ("Carolus Decl.") ¶¶ 3-4. The
7  potential recovery, though meaningful to Carolus, did not justify the costs of individual litigation.[1]
8  And he lacked the resources to hire an attorney by the hour, particularly in the wake of such a
9  substantial financial loss. *Id*. It was only in the context of a putative class action that he obtained
10 counsel willing to take the case. And now, Coinbase seeks to compel him to individual arbitration—
11 the very forum that initially made representation impossible.

**B. Coinbase's one-sided arbitration agreement.**

      The arbitration clause Coinbase now seeks to enforce does not provide a genuine path to relief. At the heart of Coinbase's arbitration clause is a class waiver. By forcing consumers to proceed one by one, it ensures that no matter how widespread Coinbase's misconduct, no collective mechanism is available to challenge it. *See* Dkt. 33-1, Ex. 5, App'x 5, § 1.3. And notably, Coinbase has already paid $100 million to resolve regulatory actions based on the *same* failures Plaintiff challenges here. *See* Exhibit A, *In the Matter of Coinbase, Inc*., Consent Order, ¶¶ 5, 73, 81.

      Next, the arbitration agreement introduced mass arbitration protocols triggered once 100 individual demands are filed. Dkt. 33-1, Ex. 5, App'x 5, § 1.8. The agreement also incorporates the American Arbitration Association's ("AAA") Consumer Arbitration Rules. *Id*. at Ex. 5, App'x 5, § 1.4. Under those rules, the AAA applies its Mass Arbitration Supplementary Rules when 25 or more similar consumer demands are filed. Exhibit B, AAA's Mass Arbitration Supplementary Rules, MA-1(c). These supplementary rules establish a system of precedent, where earlier rulings are binding on absent parties. *Id.* MA-6(c)(i)-(iv), (ix)-(xi); MA-6(d). Future claimants are funneled into consolidated proceedings and subject to the outcome of earlier arbitrations about which they

---

[1] Plaintiff's Counsel has already invested well over $100,000 in attorney time and expect to invest at least $15,000 in expert fees before discovery even begins. Caparco Decl. ¶¶ 3-4.

1  had no notice, no opportunity to participate, and no meaningful ability to contest the result—yet
2  they are bound all the same. This change was risky for Coinbase. Commentators noted that
3  changing from traditional bilateral arbitration to procedures that resemble class litigation risked
4  losing the protections of the FAA.[2]

5  Worse still, Coinbase retains the ability to terminate the arbitration altogether. Ex. B, MA-
6  10(d)–(e). If it refuses to pay its share of arbitration fees—as it did in *Bernstein* when faced with
7  over 10,000 demands—the arbitration provider may terminate the proceedings. *Bernstein v.*
8  *Coinbase Global Inc.*, No. 1:25-cv-05313, Dkt. 1 ¶¶ 51–61 (N.D. Ill. May 13, 2025). The affected
9  consumers were left with no forum except federal court; Coinbase's preferred forum. Consumers,
10 by contrast, have no comparable power to relocate to federal court.

11 The imbalance does not end there: the agreement includes a fee shifting clause. *See* Dkt.
12 33-1, Ex. 5, App'x 5, § 1.7. If a consumer challenges arbitration in court and loses—even
13 partially—they may be required to reimburse Coinbase for its attorneys' fees and costs. Coinbase
14 has already invoked this clause—threatening to seek fees from Plaintiff if its motion to compel is
15 granted. Declaration of Justin M. Caparco ("Caparco Decl.") ¶¶ 5. This provision penalizes
16 consumers for exercising their right to challenge arbitration.

17 Viewed together, these terms create a system in which Coinbase controls the process, the
18 timing, and the stakes. Consumers, meanwhile, face shifting procedures, binding outcomes from
19 proceedings they were never part of, and financial penalties for resisting. The structure is built to
20 deter enforcement, discourage participation, and insulate Coinbase from liability.

21 **III. ARGUMENT**

22 Coinbase's motion sidesteps a fundamental problem: its class waiver is unconscionable
23 under *Discover Bank*. The Ninth Circuit recently clarified that the FAA does not preempt that rule
24 as applied to the mass arbitration procedures Coinbase itself chose. And even putting the *Discover*
25 *Bank* rule aside, Coinbase's arbitration clause is unconscionable and therefore unenforceable.

---

[2] *See, e.g.*, Myriam E. Gilles, *Arbitration's Unraveling*, 172 U. Pa. L. Rev. 1063 (2024); Richard Frankel, *Fighting Mass Arbitration: An Empirical Study of the Corporate Response to Mass Arbitration and Its Implications for the Federal Arbitration Act*, 78 Vanderbilt L. Rev. 133 (2025)

**A. The *Discover Bank* rule renders Coinbase's arbitration agreement unconscionable.**

The *Discover Bank* rule rests on California's longstanding recognition that class actions are essential for consumers to challenge widespread misconduct involving small individual losses. *Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1105 (Cal. 2005) (citing *Vasquez v. Superior Court*, 484 P.2d 964 (Cal. 1971)). It deems class waivers unconscionable where (1) the agreement is adhesive, (2) the disputes involve predictably small sums, and (3) the defendant is alleged to have systematically exploited consumers. *Id*. at 1110; *see also Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 983 (9th Cir. 2007) (holding that not all three factors need to be present).

All factors are present here. Coinbase's agreement is adhesive—offered on a take-it-or-leave-it basis, with no ability to opt out. *See Bielski*, 87 F.4th at 1014. The harms at issue are predictably modest; FTC data show average losses between $800 and $8,000, well within the range courts have found "small." *See* Compl. ¶ 15; *see also Omstead v. Dell, Inc.*, 594 F.3d 1081, 1086 (9th Cir. 2010) (finding $1,200-1,500 small); *Oestreicher v. Alienware Corp.*, 322 F. App'x 489, 492 (9th Cir. 2009) (finding $4,000 small). And the complaint alleges Coinbase enabled and knowingly profited from fraudulent activity through small transaction fees, typically 0.5% to 1%. Compl. ¶¶ 52-53. Under *Discover Bank*, Coinbase's arbitration agreement is unconscionable.

**1. The *Discover Bank* rule is only preempted as applied to bilateral arbitration.**

The Ninth Circuit recently held that the FAA does not preempt the *Discover Bank* rule as applied to mass arbitration (*Heckman*, 120 F.4th at 689 (9th Cir. 2024))—relying on Supreme Court precedent that limits preemption to doctrines interfering with the core features of traditional arbitration: speed, informality, and individualized proceedings (*see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011)).[3] The Supreme Court has emphasized that class proceedings introduce procedural complexity, higher stakes, and the involvement of absent parties—all of which are incompatible with the FAA's envisioned model. *Id*. at 347–49. *Discover Bank* was preempted

---

[3] *See also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 656 (2022) (holding that a state rule compelling mass joinder in arbitration was preempted because it eliminated the individualized character of the proceeding); *Hodges v. Comcast Cable Communications, LLC,* 21 F.4th 535, 543 (9th Cir. 2021) (holding that rules requiring broad injunctive relief on behalf of third parties interfered with the FAA's vision of bilateral arbitration and were therefore preempted).

in that context because it required class arbitration, thus altering the nature of arbitration in ways that frustrated the FAA's purpose. *Id*. at 351 (explaining that class arbitration "is not arbitration as envisioned by the FAA.").

The Ninth Circuit recognized that mass arbitration is different. It sacrifices the speed, informality, and one-on-one nature of traditional bilateral arbitration for procedures that mirror class or consolidated litigation. *Heckman*, 120 F.4th at 689-90. As a result, the FAA's protection does not extend to mass arbitration procedures because it lacks these fundamental attributes. *Id*. The *Heckman* court even questioned whether such a system qualifies as arbitration at all. As Judge Van Dyke put it, calling something "arbitration" does not make it so:

> Simply labeling something as "arbitration" does not automatically bring it within the ambit of the FAA's protection. Imagine, for example, an arbitration clause that required the parties to resolve their disputes through a vigorous, winner-take-all game of ping-pong. Would the label "arbitration" be enough to bring that agreement under the FAA and protect such an "arbitration" agreement from state laws deeming it unconscionable? Of course not.

*Id.* at 691 (concurring, J. Van Dyke).

Coinbase abandoned the features of bilateral arbitration when it implemented the mass arbitration procedures, thus subjecting the agreement to the *Discover Bank* rule. *See Viking River Cruises*, 596 U.S. at 656. Coinbase's mass arbitration protocol—developed nearly a century after the FAA's enactment—does not share the speed, informality, and individualized nature of bilateral arbitration. It is a complex procedure that provides for "precedent" and implicates the due process rights of third parties. Ex. B, MA-6(c)(x) ("previously issued rulings… are binding on subsequent cases."); *see also* MA-6(d). Interfering with that system via the *Discover Bank* rule does not obstruct the FAA's objectives because that system is not what the FAA was designed to protect.

And this was Coinbase's choice. It could have implemented a class waiver within a traditional bilateral arbitration agreement protected by the FAA, but it knew the risks: thousands of individual arbitration demands and crippling filing fees. So, it opted for mass arbitration—opening the door to *Discover Bank's* application—despite *Concepcion's* clear warning that arbitration loses its FAA protection once the parties depart from bilateral arbitration. *Concepcion*, 563 U.S. at 351

(holding that parties agreeing to aggregate arbitration are not "agreeing to arbitration as envisioned by the FAA…").

Coinbase may rely on *Kohler* to argue that its mass arbitration provision is not unconscionable. *Kohler v. Whaleco, Inc.*, 757 F. Supp. 3d 1112 (S.D. Cal. 2024). But *Kohler* was decided just weeks after the Ninth Circuit's ruling in *Heckman*, before its full implications were understood by either the parties or the court. The *Kohler* court did not consider whether the class waiver was unconscionable under *Discover Bank*. Instead, the court assumed—incorrectly, in light of *Heckman*—that the FAA protected the mass arbitration procedures. *Heckman* makes clear it does not. Once FAA protection falls away, the class waiver is subject to ordinary unconscionability review under *Discover Bank*. Nor is it necessary to reach the delegation clause as the *Kohler* court did because mass arbitration "is not arbitration as envisioned by the FAA." *Concepcion*, 563 U.S. at 351. Regardless, delegating arbitrability in an agreement that includes a class waiver is itself problematic, since the waiver prevents most consumers from securing counsel to challenge arbitrability in the first place. Carolus Decl. ¶ 5. Not to mention Coinbase's mass arbitration protocol gives the arbitrator sole discretion to decide whether challenges to the delegation clause merit individualized consideration—raising serious due process concerns. See Ex. B, MA-6(d); *see also supra* § III.B.2.i.

### 2. Unconscionability is assessed at contract formation—without reference to "post-contract formation circumstances."

Coinbase may argue that mass arbitration hasn't yet been triggered. But that's irrelevant. California courts assess unconscionability based on the circumstances present at the time of contracting, without considering "post-contract formation circumstances." *Ramirez v. Charter Communications, Inc.*, 551 P.3d 520, 539 (Cal. 2024). This principle is "blackletter law[.]" *Yeng Sue Chow v. Levi Strauss & Co.*, 49 Cal. App. 3d 315, 325 (Ct. App. 1975).

Federal courts have applied this logic directly to mass arbitration clauses. In *Pandolfi*, for example, the court held that a bellwether arbitration clause had to be evaluated for unconscionability at the time of contracting, particularly where companywide policies made it foreseeable that the clause would be invoked. *Pandolfi v. AviaGames, Inc.*, 2024 WL 3558853, at

*4 (N.D. Cal. July 26, 2024); *see also MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1041 (N.D. Cal. 2022) (considering the chilling effect of a bellwether provision on absent class members).

Here, it was entirely foreseeable that Plaintiff's claims—based on Coinbase's systemic failure to implement basic "Know Your Customer"/Anti-Money Laundering safeguards—would give rise to a wave of similar claims.[4] And Coinbase has already faced mass arbitration demands based on company-wide policies. *Bernstein*, No. 1:25-cv-05313, Dkt. 1 ¶¶ 51–61 (N.D. Ill. May 13, 2025). Given this context, it was foreseeable at the time of contracting that the mass arbitration clause would be in play. And it makes sense to evaluate unconscionability at the time of contract formation. Otherwise, courts would be forced to wait until mass filings actually materialize—effectively requiring dozens or hundreds of plaintiffs to trigger review of a clause whose application was entirely predictable.

### 3. Plaintiff's losses are not too high to invoke the *Discover Bank* rule.

Coinbase might also argue that Plaintiff's losses are not "small" under the *Discover Bank* rule. But unconscionability is assessed at the time of contract formation—without reference to "post-contract formation circumstances"—when it was entirely predictable that Plaintiff would lose only a small amount. *Ramirez*, 551 P.3d at 539. Moreover, the relevant inquiry is not whether Plaintiff's losses exceed some arbitrary threshold, but whether the class waiver effectively denies consumers a practical means of enforcing their rights. *Discover Bank*, 113 P.3d at 1108-09.

#### i. The relevant inquiry is whether Plaintiff alleged predictably small losses at the time of contracting.

Unconscionability is assessed based on the circumstances at the time of contracting—not with the benefit of hindsight. *Ramirez*, 551 P.3d at 539. What matters is whether Coinbase's alleged misconduct involved predictably modest, individualized losses. *Discover Bank*, P.3d at 1108-09. Here, Plaintiff alleges just that: Coinbase's systemic failure to follow basic fraud safeguards exposed users to scams involving average losses between $800 and $8,000. Compl. ¶ 15. Those

---

[4] Indeed, Plaintiff's class definition is: "All persons in the United States who…bought or transferred cryptocurrency on the Coinbase platform, or the Coinbase Wallet website or application." Given this class definition, almost every Coinbase user has a potential claim.

allegations squarely fall within *Discover Bank's* scope. *See Omstead,* 594 F.3d at 1086 (holding $1,500 was a "small amount"); *Oestreicher*, 502 F. Supp. 2d at 1067 (holding $4,000 was a "small amount").[5]

Focusing on contract formation—rather than post-contract formation circumstances—also avoids arbitrary results. If enforceability turned on how much a particular user happened to lose, the same boilerplate clause could be enforceable for some users but not others based solely on happenstance. And paradoxically, those most seriously harmed—and thus most in need of a collective remedy—would be presumed to need class mechanisms the least.

> ii. **Even considering Plaintiff's losses, individual enforcement remains impractical.**

Even if Plaintiff's actual damages are considered, the *Discover Bank* rule still applies. The relevant inquiry is not the dollar amount lost, but whether the class waiver effectively operates as an exculpatory clause by denying a practical path to relief. *See Oestreicher*, 322 F. App'x at 492. Courts have routinely recognized that even substantial individual losses do not make arbitration feasible when litigation is complex and costly.[6] In *Massie*, for example, claims ranging from $10,000 to $80,000 were still subject to *Discover Bank* because no individual would rationally invest the time and resources required to litigate them. *See Massie v. Ralphs Grocery Co.*, No. B224196, 2012 WL 1078562, at * 6 (April 2, 2012 Cal. Ct. App.); *see also Indep. Ass'n of Mailbox Ctr. Owners, Inc. v. Superior Court*, 133 Cal. App. 4th 396, 408-411 (2005) (damages exceeding $470,000 did not preclude class relief).

That logic holds here. Plaintiff's Counsel has already spent well over $100,000 in attorney time investigating the claims, and expert costs are expected to exceed $15,000 before discovery even begins. Caparco Decl. ¶¶ 3-4. The case involves complex and unsettled issues in

---

[5] Coinbase charges fees ranging from 0.5% to 1% of each transaction.

[6] Coinbase might argue that cases involving individual sums exceeding $1,000 do not meet the *Discover Bank* rule, citing *Provencher v. Dell, Inc.*, 409 F. Supp. 2d 1196, 1202-04 (C.D. Cal. 2006), but that case has been heavily criticized as inconsistent with the *Discover Bank* rule. *See, e.g., Cohen v. DirectTV*, 142 Cal. App. 4th 1442, 1452 (2006) (holding that losses exceeding "$1,000 do not take class action waiver outside" the *Discover Bank* rule); *Oestreicher*, 502 F. Supp. 2d 1061 (same); *Douglas v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 495 F. 3d 1062, 1068 (9th Cir. 2007) (rejecting *Provencher*).

cryptocurrency tracing and regulatory compliance—making individual arbitration prohibitively expensive.[7] Plaintiff nearly let his claims lapse because he couldn't find counsel willing to proceed without the possibility of class relief. Carolus Decl. ¶¶ 3-4. The class waiver thus functions exactly as *Discover Bank* warned—shielding Coinbase not on the merits, but by making enforcement functionally impossible.

As in *Heckman*, Coinbase implemented mass arbitration procedures that depart from the bilateral model protected by the FAA. That departure brings the *Discover Bank* rule back into play—and under that rule, the class waiver at the heart of Coinbase's agreement is unconscionable. The arbitration agreement is thus unenforceable under California law.

### B. Even if California's *Discover Bank* rule does not apply, Coinbase's delegation and arbitration clauses are unconscionable.

Section 2 of the Federal Arbitration Act provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Where the challenged arbitration clause contains a delegation clause, unconscionability arguments must be directed at the delegation clause. *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015). As this Court recently confirmed, "a party may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable." *Bielski*, 87 F.4th at 1009.

California law follows a sliding scale approach to unconscionability: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Sanchez v. Valencia Holding Co.*, 353 P.3d 741, 748 (Cal. 2015) (quoting A*rmendariz v. Foundation Health Psychare Services, Inc.*, 6 P.3d 669, 690 (Cal. 2000)).

---

[7] Coinbase may argue that this focus on Plaintiff's ability to vindicate his rights is foreclosed by the Supreme Court's decision in *Italian Colors*. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013). But the arbitration agreement at issue in *Italian Colors* was protected by the FAA; Coinbase's mass arbitration agreement is not. *See Heckman*, 120 F.4th at 689-90.

### 1. The arbitration agreement and the delegation clause are procedurally unconscionable.

"Under California law, procedural unconscionability addresses contract negotiation formation and focuses on 'oppression *or* surprise due to unequal bargaining power.'" *Bielski*, 87 F.4th at 1013 (citing *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (2012)) (emphasis added). Oppression exists where "unequal bargaining power results in 'no real negotiation and an absence of meaningful choice.'" *Bielski*, 87 F.4th at 1013 (citing *Grand Prospect Partners v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1347 (2015)).

There is no dispute that Coinbase's User Agreement—including the delegation clause—is a contract of adhesion. As Coinbase concedes, users must accept its terms to maintain an account. Def. Memo at 12; *see also Bielski*, 87 F.4th at 1014 ("we have little trouble finding [Coinbase's] delegation provision was presented as an adhesion contract"). That alone establishes procedural unconscionability.[8]

Surprise turns on whether the disputed terms are buried in a "prolix" and densely worded form that an ordinary consumer would have no ability to understand. *Patterson v. ITT Consumer Fin. Corp.*, 14 Cal. App. 4th 1659, 1664 (Ct. App. 1993). Although the Ninth Circuit found Coinbase's general dispute resolution terms clearly presented in *Bielski*, that analysis focused on Section 8 of the agreement. *Bielski*, 87 F.4th at 1014 The delegation clause at issue here appears nowhere near that section. Instead, it is tucked more than 60 pages later, in Appendix 5, buried within a dense paragraph titled "Authority of Arbitrator."

The clause itself is anything but clear: a single 14-line sentence riddled with exceptions, cross-references to other contract sections, and links to 44 additional pages on the AAA's website. It is "a paragon of prolixity," one that a typical user could not reasonably be expected to navigate— let alone understand. *Oto, LLC v. Koh*, 447 P.3d 680, 691 (Cal. 2019). This complexity, combined with its remote placement and legal jargon, renders the delegation clause both oppressive and surprising. Plaintiff's assent to these terms was, at most, "formulaic rather than informed." *Id*. at

---

[8] The *Bielski* court analyzed both oppression and surprise to reach its conclusion that plaintiff established a "low" level of procedural unconscionability. *Bielski*, 87 F.4th at 1013. Carolus maintains, however, he need only establish oppression or surprise to satisfy procedural unconscionability. *See Pinnacle Museum Tower Ass'n*, 282 P.3d at 1232.

1  692. Taken together, these circumstances establish that the delegation clause is marked by
2  procedural unconscionability.

### 2. Coinbase's arbitration agreement and the delegation clause contain a significant degree of substantive unconscionability

Substantive unconsciounability focuses on "the fairness of an agreement's actual terms." *Pinnacle*, 282 P.3d at 1232. California law does not tolerate provisions that are "overly harsh, unduly oppressive, or unfairly one-sided"—especially in contracts of adhesion. *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021). The Ninth Circuit has already recognized that Coinbase's arbitration agreement contains at least some degree of substantive unconscionability. *See Bielski*, 87 F.4th at 1015 ("a lack of mutuality in the delegation provision, combined with the pre-arbitration dispute resolution process establishes, at most, a low level of substantive unconscionability").

But Plaintiff raises several additional grounds not considered in *Bielski*. First, Coinbase's mass arbitration clause—adopted after *Bielski*—imposes binding precedent without notice or assurances of adequate representation.[9] Second, the agreement now permits Coinbase to unilaterally avoid arbitration by withholding fees; a tactic it has already used. Third, Plaintiff contests a fee-shifting provision that deters users from asserting their rights in court. Together, these provisions create a lopsided dispute resolution process that far exceeds the one challenged in *Bielski*.

#### i. Coinbase's group arbitration binds absent parties without due process.

Coinbase's mass arbitration protocol is fundamentally unfair. It applies binding precedent from earlier decisions to future claimants who had no notice, no opportunity to be heard, and no meaningful representation. That violates basic due process. *Heckman*, 120 F.4th at 684 ("It is black-letter law that binding litigants to the rulings of cases in which they have no right to participate—let alone case of which they have no knowledge—violates basic principles of due process."). The Supreme Court has long made clear that absent class members cannot be bound by a proceeding

---

[9] https://web.archive.org/web/20210412140702/https://www.coinbase.com/legal/user_agreement/united_states

unless they receive notice, an opportunity to opt out, and adequate representation. *See, e.g., Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985).

Coinbase's rules disregard these basic safeguards. Under its mass arbitration protocol, rulings from confidential batched arbitrations are applied to future arbitrations. Ex. B, MA-6(c)(x) ("previously issued rulings… are binding on subsequent cases."). Future claimants receive no notice, no opportunity to participate, and no assurance of adequate representation. As in *Heckman*, Coinbase seeks to claim "many of the procedural protections and advantages of a class action, but provide [claimants] virtually none of its protections or advantages." *Heckman*, 120 F.4th at 685.

This is not an indictment of group arbitration itself, but of group arbitration stripped of procedural safeguards. Even in arbitration, absent parties must be afforded notice and a right to opt out before being bound. *Concepcion*, 563 U.S. at 349 (citing *Phillips*, 472 U.S. at 811-12). Arbitration can modify a vast range of procedural rules—but that flexibility ends where due process begins.

And to be clear, Coinbase's system threatens to preclude future claimants from challenging the delegation clause. Ex. B, MA-6(c)(x); MA-6(d). The arbitrator may determine that jurisdictional issues "do not need to be made on an individual basis," effectively deciding gateway questions for future claimants.[10] *Id*. MA-6(d). If an arbitrator upholds the delegation clause, they have unchecked discretion to determine whether that ruling binds all future claimants. *Heckman*, 120 F.4th at 684. That risk is not hypothetical. If an ongoing mass arbitration is already underway, Plaintiff's ability to challenge the delegation clause may have already been foreclosed.[11]

Nor can Coinbase justify this system by claiming the precedent is "mutual." In reality, only Coinbase knows the outcome of the batched proceedings and it can adjust its contract terms to select a different arbitral forum if it doesn't like the results. Future claimants, by contrast, litigate

---

[10] Coinbase will likely point to MA-6(c)(ix), which requires the arbitrator to give future claimants "the opportunity to address the applicability" of precedent before issuing a "final determination." But that safeguard applies only to merits-based precedent. Jurisdictional issues are governed separately—by MA-6(d)—which grants the arbitrator unilateral authority to decide whether those issues "do not need to be made on an individual basis." In other words, gateway questions like the enforceability of the delegation clause can be resolved without any input from the claimants who will be bound by the outcome.

[11] This might sound outlandish, but in *Pandolfi*, the plaintiff brought a class action suit only to find out there was an ongoing mass arbitration. *Pandolfi,* 2024 WL 3558853, at *6.

PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO COMPEL
CASE NO. 3:25-CV-03089-CRB

in the dark. Beyond that, the use of precedent is not symmetric because Coinbase litigated those cases—future claimants did not. That is why non-mutual issue preclusion is permissible against a party involved in an earlier case, but impermissible against a new party.

Coinbase might argue that arbitrators retain discretion not to apply precedent. But, as the *Heckman* court observed, that would defeat the purpose of mass arbitration:

> [I]t is obvious that anything more than an occasional failure to apply precedent established in the bellwether cases would defeat the very purpose of the mass arbitration protocol. Indeed, it is implausible to the point of near impossibility that an arbitrator, absent some compelling reason, would fail to apply the precedent established in the bellwether cases.

*Heckman*, 120 F.4th at 685. And even so, unbounded discretion is no substitute for due process. Mass arbitration procedures therefore create a "serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability." *Id*. (quoting *Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 963 (C.D. Cal. 2023)). Justice Scalia said it best: it is "odd to think that an arbitrator would be entrusted with ensuring that third parties' due process rights are satisfied." *Concepcion*, 563 U.S. at 349–50.

### ii. The arbitration agreement is illusory.

An agreement to arbitrate is unconscionable if one party retains the unilateral power to nullify it. That is precisely the case here. A contract that allows the drafter to escape its obligations at will is not a real agreement—it is illusory. *See Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003) (holding arbitration clause was unconscionable where the employer could unilaterally terminate it); *see also Brashear v. Halliburton Energy Servs.*, Inc., No. 1:20-cv-0505-NON JLT, 2020 WL 4596116, at *14 (E.D. Cal. Aug. 11, 2020) (same).[12]

Here, Coinbase—aided by the AAA's rules—has given itself the unilateral ability to walk away from arbitration simply by refusing to pay its fees. Under the mass arbitration protocol, if Coinbase withholds payment, the AAA may terminate the proceeding altogether. Ex. B, MA-10(d)–(e). The consumer is then forced to refile in court. Other Circuits have already endorsed this

---

[12] Other circuits agree. *See Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219-20 (10th Cir. 2002); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315-16 (6th Cir. 2000); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1133 (7th Cir. 1997).

1  practice, holding that the "arbitration was complete" when the AAA terminated proceedings due to
2  the defendant's refusal to pay its share of the fees. *See Wallrich v. Samsung Elecs. Am., Inc.,* 106
3  F.4th 609, 620 (7th Cir. 2024).

4  And Coinbase has already done exactly that. After facing over 10,000 arbitration demands,
5  Coinbase simply refused to pay the required filing fees. *See Bernstein v. Coinbase Global Inc.*, No.
6  1:25-cv-05313, Dkt. 1 ¶¶ 51–61 (N.D. Ill. May 13, 2025). The AAA terminated the proceedings,
7  leaving plaintiffs with no choice but to file in federal court. The one-sided nature speaks for itself:
8  if Plaintiff is compelled to arbitrate, he cannot refuse to pay and exit the process.

### iii. The User Agreement impermissibly shifts arbitration-related fees onto Plaintiff.

11  Courts have consistently recognized that contractual provisions imposing additional
12  arbitration costs on consumers or employees reflect procedural and substantive unconscionability.
13  *See Ingle*, 328 F.3d at 1178. As the California Supreme Court made clear, an employee—or, by
14  extension, a consumer—"cannot be required to bear any type of expense that [they] would not be
15  required to bear…in court." *Armendariz*, 6 P.3d at 687.

16  The California Supreme Court recently struck down a fee-shifting provision that allowed
17  an employer to recover its attorneys' fees after successfully compelling arbitration, finding that it
18  imposed an improper deterrent to challenging the agreement's enforceability. *Ramirez*, 551 P3d at
19  540-41. The Court found the provision unconscionable because it "could chill an employee's right
20  to challenge the enforceability of the arbitration agreement" even if some of the "arguments made
21  by the resisting party are successful." *Id*.

22  Coinbase's User Agreement includes a nearly identical clause. It states that if a party seeks
23  a court order to compel arbitration, the prevailing party "shall have the right to collect from the
24  other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees." *See* Dkt.
25  33-1, Ex. 5, App'x 5, § 1.7. Realistically, only Coinbase will be compelling arbitration. Thus, this
26  provision exposes a consumer to substantial liability merely for asserting a legal challenge to

arbitration—a risk they would not face in court. Like the clause in *Ramirez*, it impermissibly chills access to justice and is therefore unconscionable.[13]

### C. Severance is improper here because the arbitration agreement is permeated with unconscionability.

Under California law, courts may refuse to enforce an agreement where unconscionable terms reflect a broader effort to tilt the forum in favor of the drafter. *See* Cal. Civ. Code § 1670.5(a); *Armendariz*, 6 P.3d at 696-97. The key inquiry is whether "the central purpose of the contract is tainted with illegality" and whether severance would serve "the interests of justice." *Ramirez*, 551 P.3d at 547 (quoting *Armendariz*, 6 P.3d at 696). Where, as here, the agreement contains multiple unconscionable provisions courts decline to sever. *See Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227, 254–55 (2015); *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 826 (2010).

Coinbase's arbitration agreement is permeated with unconscionability and cannot be salvaged through severance. It contains a class waiver that forecloses relief, imposes mass procedures that bind non-parties without due process, allows Coinbase to evade arbitration, and punishes individuals for challenging the clause.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court deny Coinbase's motion. Not only does the class waiver violate the *Discover Bank* rule, but Coinbase's mass arbitration procedures raise serious due process concerns—concerns that may have already precluded Plaintiff from meaningfully challenging the delegation clause. For these reasons, and those set forth more fully in this brief, Coinbase's motion should be denied.

Dated: July 14, 2025                             Respectfully submitted,

                                                 STEPHAN ZOURAS, LLC

                                                 By: /s/ Justin M. Caparco
                                                     Justin Caparco
                                                     *Counsel for Plaintiff*

---

[13] Coinbase may argue that *Ramirez* is inapplicable because it involved employment claims. But the Court's reasoning was not limited to that context. A fee-shifting clause can be unconscionable even if it doesn't violate a specific statute.