1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BRIAN CAROLUS,

Plaintiff,

v.

COINBASE GLOBAL, INC., et al.,

Defendants.

Case No.  25-cv-03089-CRB

**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Plaintiff Brian Carolus is suing Defendants Coinbase, Global, Inc., Coinbase, Inc., and Coinbase Bermuda Services, Ltd. ("Coinbase") for violation of California's Unfair Competition Law, breach of contract, and unjust enrichment.  Coinbase now moves to compel arbitration and stay all proceedings pursuant to the Arbitration Agreement in the 2022 Coinbase User Agreement.  Mr. Carolus opposes, contending that the Arbitration Agreement is unenforceable.  He argues that the Delegation Clause is unenforceable because it is procedurally and substantively unconscionable.  He also challenges the incorporated American Arbitration Association ("AAA") Mass Arbitration Supplementary Rules ("Supplementary Rules").  In his view, these rules eliminate the bilateral nature of Coinbase's arbitration, removing the protections of the Federal Arbitration Act ("FAA"). On that basis, he asserts that California's <u>Discover Bank</u> rule renders the Class Waiver unconscionable.  In the alternative, he argues that other aspects of the Arbitration Agreement are unenforceable under a traditional unconscionability analysis.  The Court concludes that the Arbitration Agreement is enforceable and that issues beyond this threshold are reserved for an arbitrator.  The Court therefore **GRANTS** Coinbase's motion to compel arbitration and **STAYS** proceedings pending the completion of arbitration.

# I.    BACKGROUND

Coinbase operates an online platform for users to buy, sell, and transfer digital currencies ("cryptocurrencies").  Nacoste Decl. (dkt. 33-1) ¶ 2.  Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global Inc. and is the operating entity for Coinbase users in the United States.  Id. ¶ 3.  Coinbase Bermuda Services Limited is a wholly owned subsidiary of Coinbase Global, Inc. and operates Coinbase Wallet, an application that allows users to store cryptocurrency with greater control and ownership of their assets.  Compl. (dkt. 1) ¶ 12.  Coinbase provides its online platform and services to its users exclusively under the terms of a Coinbase User Agreement.  Nacoste Decl. ¶ 8.  To create an account and use Coinbase's services, prospective users must expressly assent to be bound by the User Agreement.  Id.  Mr. Carolus created a Coinbase account and accepted the Coinbase User Agreement on April 19, 2021.  Id. ¶ 10; Nacoste Decl. Ex. 4.  Coinbase periodically updates the terms of its User Agreement.  Nacoste Decl. ¶ 14.

On January 26, 2022, Coinbase emailed accountholders, including Mr. Carolus, to inform them that Coinbase would be updating its User Agreement the following week.  Id. ¶ 15.  In this email, Coinbase explained that accountholders must accept the updated 2022 User Agreement if they wanted to continue using their account.  Id.; Nacoste Decl. Ex. 2.  The email provided a hyperlink to the full terms of the updated User Agreement and encouraged users to "make sure [to] read the updated User Agreement."  Nacoste Decl. Ex. 2.  The email also contained a bullet point summary of the information in the User Agreement, including "Clarity on Dispute Resolution" in bold, and flagged changes in the 2022 User Agreement's Arbitration Agreement.  Id. ("We've revised our arbitration agreement to streamline the process for resolving problems you may experience.").

As of February 2022, users who had not yet accepted the 2022 User Agreement, including Mr. Carolus, were redirected to a landing page when they logged into their Coinbase account.  Nacoste Decl. ¶ 15.  The landing page presented a scroll-box containing the full text of the 2022 User Agreement.  Id.  Above the scroll-box was a directive to "review and accept [the] updated terms and conditions to continue using [their]

Coinbase account." <u>Id.</u> Users could accept the terms of the 2022 User Agreement by clicking a blue "[a]ccept terms" button at the bottom of the page. <u>Id.</u> Coinbase's records reveal that Mr. Carolus accepted the updated User Agreement on August 24, 2022. <u>Id.</u> ¶ 17; Nacoste Decl. Ex. 4.

The 2022 User Agreement includes the Arbitration Agreement. <u>See</u> Arbitration Agreement (Nacoste Decl. Ex. 5, App'x 5). The Arbitration Agreement provides:

> Subject to the terms of this Arbitration Agreement, you and Coinbase agree that any dispute, claim, disagreements arising out of or relating in any way to your access to or use of the Services or of the Coinbase Site, any Communications you receive, any products sold or distributed through the Coinbase Site, the Services, or the User Agreement and prior versions of the User Agreement, including claims and disputes that arose between us before the effective date of these Terms (each, a "Dispute") will be resolved by binding arbitration, rather than in court.

<u>Id.</u> § 1.1.

The Arbitration Agreement includes a Class Waiver, stating in all caps that:

> YOU AND COINBASE AGREE THAT, EXCEPT AS SPECIFIED IN SUBSECTION 1.8, EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRE-SENTATIVE, OR COLLECTIVE BASIS, AND THE PAR-TIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLEC-TIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DIS-PUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER.

<u>Id.</u> § 1.3.

The Arbitration Agreement incorporates the AAA Consumer Arbitration Rules to facilitate the arbitration procedures. <u>Id.</u> § 1.4. If a party "invoke[s] the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration … shall have the right to collect" reasonable costs and attorneys' fees. <u>Id.</u> § 1.7.

The Arbitration Agreement also includes the following Batch Arbitration Provision governing how multiple claims filed by the same law firm or law firms will be arbitrated:

> To increase the efficiency of administration and resolution of arbitrations, you and Coinbase agree that in the event that there are one hundred (100) or more individual Requests of a substantially similar nature filed against Coinbase by or with the assistance of the same law firm, group of law firms, or organizations, within a thirty (30) day period (or as soon as possible thereafter), the AAA shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests)[.]

Id. § 1.8.  The Batch Arbitration Provision explains that parties can dispute batching decisions, including the applicability of the Batch Arbitration Provision, before an arbitrator.  Id.  The Batch Arbitration Provision requires each batch of arbitrations to be resolved "as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award."  Id.  The Batch Arbitration Provision clarifies that "in no way" shall it "be interpreted as authorizing a class, collective, and/or mass arbitration or action of any kind."  Id.

Additionally, the Arbitration Agreement contains a Delegation Clause titled "Authority of the Arbitrator," which reads, in relevant part, as follows:

> The arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement, **except for the following**: (1) all Disputes arising out of or relating to the Section entitled "Waiver of Class and Other Non-Individualized Relief," including any claim that all or part of the Section entitled "Waiver of Class and Other Non-Individualized Relief" is unenforceable, illegal, void or voidable, or that such Section entitled "Waiver of Class and Other Non-Individualized Relief" has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in the subsection entitled "Batch Arbitration," all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided

only by a court of competent jurisdiction and not by an
arbitrator; and (4) all Disputes about which version of the
Arbitration Agreement applies shall be decided only by a court
of competent jurisdiction and not by an arbitrator.

Id. § 1.6 (emphasis added).  The Delegation Clause thereby carves out certain disputes for

judicial resolution, including challenges to the validity of the Class Waiver.  Id.

Mr. Carolus sues Coinbase individually and on behalf of a nationwide class of

Coinbase users.  Compl. ¶ 74.  He alleges that he lost over $100,000 in a cryptocurrency

scam that was operated through Coinbase's platform, and that Coinbase failed to protect

users from fraudulent schemes.  Id. ¶¶ 67, 91.  Coinbase moves to compel arbitration under

the 2022 Coinbase User Agreement's Arbitration Agreement.  Mot. (dkt. 33) at 2; Reply

(dkt. 36) at 13.  Mr. Carolus opposes on the grounds that the Delegation Clause, the Class

Waiver, and other aspects of the Arbitration Agreement are unconscionable.  Opp'n (dkt.

34) at 1.

## II.    LEGAL STANDARD

Contracts relating to a commercial transaction are subject to the FAA.  Chiron

Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000).  The FAA

provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save

upon such grounds as exist at law or in equity."  9 U.S.C. § 2.  The grounds for

invalidating an arbitration agreement include "generally applicable contract defenses, such

as fraud, duress, or unconscionability."  AT&T Mobility LLC v. Concepcion, 563 U.S.

333, 339 (2011) (citation omitted).

"[A]ny party bound to an arbitration agreement that falls within the scope of the

FAA may bring a motion in federal district court to compel arbitration."  Magana v.

DoorDash, Inc., 343 F. Supp. 3d 891, 898 (N.D. Cal. 2018) (citing 9 U.S.C. §§ 3–4).

Although courts often determine gateway issues of arbitrability, "parties 'may delegate

such arbitrability questions to the arbitrator, so long as the parties' agreement does so by

clear and unmistakable evidence."  Pearl v. Coinbase Glob., Inc., No. 22-cv-3561-MMC,

2023 WL 1769190, at * 2 (N.D. Cal. Feb. 3, 2023) (quoting Henry Schein, Inc. v. Archer

& White Sales, Inc., 586 U.S. 63, 69 (2019)).  Only if that standard is met does the Court

evaluate whether the delegation clause itself is enforceable.  Brennan v. Opus Bank, 796 F.3d 1125, 1132 (9th Cir. 2015) (before determining whether a delegation clause is itself unconscionable, the court must determine that the parties "clearly and unmistakably delegat[ed] arbitrability questions to the arbitrator.").  If there is an enforceable delegation clause, the court must leave challenges to other provisions for the arbitrator.  Id.

## III.    DISCUSSION

The Court must first determine if a valid arbitration agreement exists and if it applies to this dispute.  Chiron, 207 F.3d at 1130.  The parties do not dispute that by signing the 2022 Coinbase User Agreement, Mr. Carolus entered into the Arbitration Agreement with Coinbase, and that it covers his breach of contract claims.  The parties instead dispute the validity of the Arbitration Agreement.  Mot. at 1; Opp'n at 1.

The Court addresses five sets of issues.  First, the Court considers whether the parties delegated arbitrability questions to the arbitrator.  Second, the Court assesses whether the Delegation Clause is procedurally and substantively unconscionable.  Third, the Court addresses whether the Class Waiver is unconscionable.  Fourth, the Court considers the remaining unconscionability arguments, addressing only those that fall within an exception to the Delegation Clause and reserving the rest for the arbitrator.  Fifth, the Court assesses Coinbase's request for a stay.

### A.    Delegation of Arbitrability

The threshold question the Court must answer is whether the Delegation Clause clearly and unmistakably assigns arbitrability questions to the arbitrator.  Henry Schein, 586 U.S. at 69; Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1209 (9th Cir. 2016).  Arbitrability refers to "whether the parties have submitted a particular dispute to arbitration."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002).  Although courts ordinarily decide this gateway issue, the parties may contract to delegate it to an arbitrator.  Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 68–69 (2010).  If the parties have clearly and unmistakably agreed to do so, a court must honor that agreement and may not decide the arbitrability question itself.  Henry Schein, 586 U.S. at 69 ("[I]f a valid

1  agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a

2  court may not decide the arbitrability issue.").

3        Coinbase argues that under the express terms of the Delegation Clause and the

4  Arbitration Agreement's incorporation of the AAA Consumer Arbitration Rules, the

5  parties clearly and unmistakably intended to delegate arbitrability questions, including the

6  enforceability of the Arbitration Agreement, to the arbitrator.  Mot. at 8–10.  There is

7  support in the case law for that position.  In Bielski, the Ninth Circuit held that a

8  substantially similar delegation clause in an earlier version of Coinbase's Arbitration

9  Agreement was valid and required that an arbitrator resolve threshold disputes.  Bielski, 87

10  F.4th at 1015.  Indeed, this Court and others have found that the same version of

11  Coinbase's Delegation Clause clearly and unmistakably delegates arbitrability to an

12  arbitrator.  See, e.g., Cordero v. Coinbase, Inc., No. 3:25-cv-4024-CRB, 2025 WL

13  2223495, at *8 (N.D. Cal. Aug. 5, 2025); Kamath v. Coinbase, Inc., No. 23-cv-3533-CRB,

14  2024 WL 950163, at *4–5 (N.D. Cal. Mar. 5, 2024); Aggarwal v. Coinbase, Inc., 685 F.

15  Supp. 3d 867, 898 (N.D. Cal. Aug. 2, 2023) (concluding that under Coinbase's 2022

16  Arbitration Agreement, "the parties clearly and unmistakably agreed to submit arbitrability

17  issues to an arbitrator."); Donovan v. Coinbase Inc., 649 F. Supp. 3d 946, 954 (N.D. Cal.

18  Jan. 6, 2023); Flores v. Coinbase, Inc., No. 22-cv-8274-MWF, 2023 WL 3564756, at *5

19  (C.D. Cal. Apr. 6, 2023).

20        The Arbitration Agreement also incorporates the AAA Rules.  Arbitration

21  Agreement §1.4.  The "incorporation of the [AAA] arbitration rules constitutes clear and

22  unmistakable evidence that the parties agreed to arbitrate arbitrability."  See Oracle Am.,

23  Inc. v. Myriad Grp. A.G., 724 F.3d 1069, 1074 (9th Cir. 2013).

24        Accordingly, the Court holds that the parties clearly and unmistakably delegated the

25  question of arbitrability to the arbitrator.  Consequently, the next question the Court must

26  answer is whether the Delegation Clause is itself unconscionable.

27     **B.    Unconscionability of Delegation Clause**

28  Courts can invalidate agreements to arbitrate based on "generally applicable

7

contract defenses, such as fraud, duress, or unconscionability." Concepcion, 563 U.S. at 339 (citation omitted).  But they cannot rely on "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." Poublon v. C.H. Robinson Co., 846 F.3d 1251, 1259 (9th Cir. 2017) (citing Concepcion, 563 U.S. at 339).  Under California law, "the party opposing arbitration bears the burden of proving ... unconscionability." Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 236 (2012).  That party "must demonstrate that the contract as a whole or a specific clause in the contract is both procedurally and substantively unconscionable." Poublon, 846 F.3d at 1260.  Procedural unconscionability and substantive unconscionability "need not be present in the same degree." Id. (quoting Sanchez v. Valencia Holding Co., LLC, 61 Cal. 4th 899, 910 (2015)).  Instead, California courts apply a "sliding scale" analysis in making determinations of unconscionability where "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Id.

To challenge a delegation clause, "the party resisting arbitration must specifically reference the delegation provision and make arguments challenging it." Bielski, 87 F.4th at 1011.  "[A] party may use the same arguments to challenge both the delegation provision and arbitration agreement, so long as the party articulates why the argument invalidates each specific provision." Id.  The rule is consistent with the approach in the Second, Third, and Fourth Circuits, where if "a party's challenge mentions and specifically relates to the validity of the delegation provision in its opposition[,] ... the federal court has a green light to consider those arguments." Id.  Because the Court may only consider challenges expressly directed at the Delegation Clause, the following analysis is limited to those arguments.

### 1.    Procedural Unconscionability

The first inquiry in determining procedural unconscionability is whether an agreement is a contract of adhesion, in which a party with superior bargaining strength

8

United States District Court
Northern District of California

presents terms on a take-it-or-leave-it basis.  Poublon, 846 F.3d at 1260–61.  There is no question that the Delegation Clause in Coinbase's 2022 Arbitration Agreement is a contract of adhesion.  Bielski, 87 F.4th at 1014 ("We have little trouble finding the delegation provision was presented as an adhesion contract[.]").  Yet an adhesive contract without more is only minimally procedurally unconscionable.  Poublon, 846 F.3d at 1261–62; Bielski, 87 F.4th at 1014 (holding that "the delegation provision's low levels of procedural and substantive unconscionability fail[ed] to tip the scales to render the [delegation] provision unconscionable and therefore unenforceable.").  To find more than minimal procedural unconscionability, courts look to whether there is oppression or surprise.  Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1280 (9th Cir. 2006).  Oppression means that there is such an inequality in bargaining power between two parties that there is no actual negotiation and a lack of meaningful choice.  Id.  Surprise means that the "supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." Id.

Mr. Carolus argues that the Delegation Clause is procedurally unconscionable because it is in an adhesion contract, and its complexity, remote placement, and use of legal jargon make the clause "both oppressive and surprising."  Opp'n at 10. Courts in this district have repeatedly rejected similar challenges to the same Delegation Clause.  See, e.g., Aggarwal, 685 F. Supp. 3d at 881–82; Kamath, 2024 WL 950163, at *9; Pearl, 2023 WL 1769190, at *6–7.  In Aggarwal, plaintiffs advanced the same argument here—that the Delegation Clause was "unfairly surprising" because it was located in Appendix 5 of a lengthy User Agreement, and cross-referenced other provisions. Aggarwal, 685 F. Supp. 3d at 881; Opp'n at 10 (arguing that the delegation clause is "buried within a dense paragraph … riddled with exceptions, cross-references to other contract sections, and links to 44 additional pages on the AAA's website.").  The court rejected this argument, noting that the 2022 User Agreement begins with a bold, all-caps notice directing users to Appendix 5 for dispute resolution provisions, and that the delegation clause is in bold and clearly labeled "Authority of the Arbitrator."  685 F. Supp.

9

3d at 881.

The Ninth Circuit also upheld Coinbase's Delegation Clause against procedural unconscionability challenges.  In <u>Bielski</u>, the court concluded that a substantially identical version of the Delegation Clause was not "beyond the reasonable expectations of the user." 87 F.4th at 1014.  The court highlighted that Coinbase's Delegation Clause appears in plain language and in a legible font, distinguishing it from the unconscionable clause in <u>OTO, LLC v. Koh</u>, 8 Cal.5th 111, 127 (Cal. 2019).  <u>Id.</u>  In contrast, the delegation clause in <u>OTO</u> was "filled with statutory references and legal jargon," the formatting was "visually impenetrable," and "challenges the limits of legality."  <u>Id.</u>  Coinbase's Delegation Clause does not have these problems.

Accordingly, there is only a minimal degree of procedural unconscionability arising from the adhesive nature of the Delegation Clause.  Where the degree of procedural unconscionability is low, the Delegation Clause "will be enforceable unless the degree of substantive unconscionability is high."  <u>Poublon</u>, 846 F.3d at 1263.

### 2.    Substantive Unconscionability

Substantive unconscionability addresses whether the terms of the agreement are so "overly harsh" or "one-sided" that they "shock the conscience."  <u>Poublon</u>, 846 F.3d at 1261 (citing <u>Sanchez</u>, 61 Cal. 4th at 912).  A court will not find "a simple old-fashioned bad bargain" unconscionable; the terms must be "unreasonably favorable to the more powerful party."  <u>Id.</u>  Where an agreement is "permeated" with unconscionability, a court will refuse to enforce an agreement, rather than sever the offending unconscionable provision.  <u>Armendariz v. Found. Health Psychcare Servs.</u>, 24 Cal.4th 83, 122 (2000).

In <u>Bielski</u>, the Ninth Circuit held that an earlier Coinbase Delegation Clause was minimally substantively unconscionable. 87 F.4th at 1015.  Mr. Carolus argues that several new challenges, combined with the holding in <u>Bielski</u>, render the Delegation Clause substantively unconscionable.  Opp'n at 11.  However, most of his new arguments concern the Arbitration Agreement, rather than the Delegation Clause itself.  <u>Id.</u> at 11–12. The only exception is his contention that the Supplementary Rules, particularly MA-

10

6(c)(x) and MA-6(d), could bar future claimants from challenging the Delegation Clause. Id. at 12. The Court addresses that argument below and considers Mr. Carolus's other challenges in subsequent sections (to the extent that they impact the Delegation Clause).

Mr. Carolus argues that future claimants could be unable to challenge the enforceability of the Delegation Clause because Supplementary Rule MA-6 permits a Process Arbitrator to decide its enforceability in one batched arbitration proceeding, with that decision then applied in subsequent arbitrations.[1] Opp'n at 12. But that concern does not render the Delegation Clause substantively unconscionable. The Supplementary Rules do not preclude a court from considering challenges directed at the Delegation Clause, nor do they strip future claimants of the right to raise their own objections. See Pandolfi v. AviaGames Inc. ("Pandolfi 1"), No. 23-cv-05971, 2024 WL 4051754, at *8 (N.D. Cal. Sept. 4, 2024) (holding that the Supplementary Rules "do[] not suggest that a dispute over whether an arbitration agreement (including a delegation provision) is unconscionable is a decision that can be made by a Process Arbitrator."). It is well-established that courts, not arbitrators, must decide challenges to the enforceability of a delegation clause. Rent-A-Center, 561 U.S. at 71–72; Mohamed, 848 F.3d at 1209. Mr. Carolus's concern that arbitrators alone could resolve questions about the enforceability of the Delegation Clause "without any input from the claimants who will be bound by the outcome," see Opp'n at 12 n.10, is misplaced; claimants who wish to challenge the Delegation Clause may do so in court.

Mr. Carolus has not demonstrated that the Delegation Clause is substantively unconscionable, and the minimal substantive unconscionability that the Ninth Circuit recognized in Bielski does not change the outcome. Balancing this minimal substantive unconscionability with the minimal procedural unconscionability, the Court holds that the Delegation Clause is enforceable.

---

[1] The Court addresses the substance of Supplementary Rule MA-6 and the Process Arbitrator in later sections. This discussion is limited to arguments concerning the Delegation Clause and a future claimant's ability to contest its enforceability.

1    The Court now turns to the issues that the parties expressly reserved for judicial

2    determination in the exceptions to the Delegation Clause.  First, the Court considers Mr.

3    Carolus's challenge to the Class Waiver under the <u>Discover Bank</u> rule.  Then, the Court

4    addresses Mr. Carolus's other substantive unconscionability arguments to determine

5    whether they fall within an exception.

6        **C.    Unconscionability of Class Waiver**

7        Because the Delegation Clause permits the parties to litigate the validity of the

8    Class Waiver in court, the Court begins by addressing Mr. Carolus's argument that the

9    Arbitration Agreement is unconscionable due to the Class Waiver.  He argues that the

10   Class Waiver is unenforceable because Coinbase utilizes mass arbitration procedures that

11   violate the <u>Discover Bank</u> rule, a California rule of contract interpretation as to class

12   waivers.  Opp'n at 5.  In response, Coinbase points to this Court's recent decision in

13   <u>Cordero</u>, 2025 WL 2223495, which held that the <u>Discover Bank</u> rule did not apply to

14   Coinbase's 2022 Arbitration Agreement because the procedures lacked the requisite

15   representative features that eliminate the preemptive effect of the FAA.  Defendants'

16   Statement of Recent Decision (dkt. 37).  Mr. Carolus insists that <u>Cordero</u> did not address

17   the Supplementary Rules incorporated into the Arbitration Agreement.  Response to

18   Statement of Recent Decision (dkt. 40) at 2.  These rules, he argues, raise separate due

19   process concerns when applied to the Coinbase batching procedures because they bind

20   absent plaintiffs to decisions made in earlier batched proceedings.  <u>Id.</u>; Opp'n at 5.

21       The Court next turns to the <u>Discover Bank</u> rule, beginning with an outline of the

22   rule and explaining when the FAA preempts the rule.  Then, the Court discusses the recent

23   decision in <u>Cordero</u>, where this Court held that the FAA preempted the <u>Discover Bank</u> rule

24   when applied to Coinbase's bilateral arbitration procedures.  Finally, the Court considers

25   whether <u>Cordero</u> is distinguishable because it did not address the Supplementary Rules.

26       **1.    <u>Discover Bank</u>**

27       In 2005, the California Supreme Court decided in <u>Discover Bank v. Superior Court</u>

28   that a class waiver is unconscionable when it "is found in a consumer contract of adhesion

United States District Court
Northern District of California

in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." 36 Cal. 4th 148, 162–63 (2005). California courts applied this rule, known as the <u>Discover Bank</u> rule, to invalidate as unconscionable arbitration agreements with class waivers. <u>See, e.g.</u>, <u>Gatton v. T-Mobile USA, Inc.</u>, 152 Cal. App. 4th 571, 586–88 (2007) (holding that an arbitration agreement was unconscionable because it contained a class waiver). But in 2011, the United States Supreme Court held that, as applied to arbitration agreements, the <u>Discover Bank</u> rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and is therefore preempted by the FAA. <u>Concepcion</u>, 563 U.S. at 352 (citation omitted). The <u>Discover Bank</u> rule interfered with the principle that "a court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for'" finding unconscionability. <u>Id.</u> at 341 (citation omitted). The <u>Discover Bank</u> rule also interfered with the FAA's purpose of "ensur[ing] that private arbitration agreements are enforced according to their terms." <u>Id.</u> at 344 (citation omitted).

The Ninth Circuit recently addressed the continued viability of the <u>Discover Bank</u> rule in <u>Heckman v. Live Nation Entertainment, Inc.</u> 120 F.4th, 670 (9th Cir. 2024), <u>petition for cert. filed sub nom.</u> <u>Live Nation Ent., Inc. v. Heckman</u>, No. 24-1145 (filed May 7, 2025). There, a group of plaintiffs brought a class action antitrust suit against Live Nation and Ticketmaster. <u>Heckman</u>, 120 F.4th at 676–77. But those plaintiffs had signed an arbitration agreement stating that their cases would be adjudicated by New Era, an arbitrator, using its newly established "Expedited Mass Arbitration" rules. <u>Id.</u> at 677–78. New Era's mass arbitration included:

- <u>Unilateral Discretion over the Arbitrator.</u> Though consumers would be entitled to participate in the selection of an arbitrator, New Era could replace the agreed-upon arbitrator at its sole discretion. <u>Id.</u> at 678.
- <u>Bellwether Trials.</u> Three bellwether trials would be litigated individually and

confidentially, and any outcome would become precedent on all common issues in all batched cases. Id. at 678–79.

- Truncated Discovery and Briefings.  Discovery was limited to 10 files totaling 250 pages, and closing briefs were limited to 15,000 characters. Id. at 679.
- One-Sided Injunctive Relief.  The parties could appeal only awards, not denials, of injunctive relief. Id. at 680.

The Ninth Circuit held that the FAA did not protect Ticketmaster and New Era's mass arbitration model. Id. at 689–90.  As the court explained, Congress contemplated bilateral arbitration—not classwide arbitration—when it passed the FAA. Id.  Thus, the Ninth Circuit distinguished Concepcion, concluded that "the FAA does not preempt California's Discover Bank rule as it applies to mass arbitration," and from there held that the Discover Bank rule rendered Ticketmaster's class waiver unconscionable. Id. at 690.

Recently, the Ninth Circuit clarified the scope of Heckman as applied to consolidated proceedings in Jones v. Starz Entertainment, LLC, 129 F.4th 1176, 1182 (9th Cir. 2025).  Consolidated proceedings are those in which individual arbitration claims that share common issues are combined into a single proceeding before the same arbitrator, but each claimant brings the claim in their individual capacity and is only bound by their own case. Id.  In Jones, the court evaluated whether an arbitration agreement that barred parties from engaging in "class or representative" proceedings also prohibited consolidated proceedings. Id.  The court explained that "[i]t is that representative feature, not the mere numerosity of parties, that forms the critical element of the 'fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration.'" Id. (citing Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 686 (2010)).  The court distinguished the mass arbitration procedures at issue in Heckman (which "contained all the red flags associated with classwide arbitration") from the consolidated, batched arbitration before it. Id.  Accordingly, the Ninth Circuit has limited the Discover Bank rule to procedures that carry the unique risks associated with mass arbitration, such as the binding effect on absent claimants in bellwether trials. Id.  Mere consolidation, where

14

1    each claimant pursues an individual claim and is not bound by another's representation,

2    does not trigger the <u>Discover Bank</u> rule.  <u>Id.</u>

3               **2.    <u>Cordero</u>**

4          This Court recently considered whether the <u>Discover Bank</u> rule applied to the

5    Coinbase 2022 Arbitration Agreement in <u>Cordero</u>, a class action against Coinbase, Inc.

6    WL 2223495, at *1, 5.  There, the plaintiffs argued that the Class Waiver was

7    unenforceable because Coinbase's arbitration procedures departed from the bilateral model

8    protected by the FAA and instead triggered the <u>Discover Bank</u> rule.  <u>Id.</u>, at *4.

9          This Court rejected that argument.  <u>Id.</u>, at *5.  This Court held that while Coinbase's

10   batching process consolidates arbitration, the process remains bilateral and does not

11   present the concerns associated with class or representative proceedings.  <u>Id.</u>  In reaching

12   that conclusion, this Court emphasized that the dispositive question is whether arbitration

13   is bilateral or representative in nature.  <u>Id.</u>  As the Supreme Court explained in <u>Viking</u>

14   <u>River Cruises, Inc. v. Moriana</u>, bilateral arbitration does not depend on the number of

15   parties involved, but on whether the procedure binds absent parties to bellwether or

16   representative outcomes.  596 U.S. 639, 656–57 (2022).  This Court stated that reading

17   "bilateral" to expand the scope of the <u>Discover Bank</u> rule beyond class or representative

18   arbitration would contravene the FAA's "liberal federal policy favoring arbitration

19   agreements" and Supreme Court precedent.  <u>Cordero</u>, 2025 WL 2223495, at *4–5 (citing

20   <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983)).

21         This Court then compared Coinbase's Batch Arbitration Provision to the

22   consolidated arbitration provision upheld by the Ninth Circuit in <u>Jones</u>.  <u>Cordero</u>, 2025

23   WL 2223495, at *5.  This Court observed that both provisions permit an arbitrator to hear

24   multiple disputes together, but do not create representative proceedings.  <u>Id.</u>  As the Ninth

25   Circuit explained, "[c]onsolidation is not the same as class or representative arbitration."

26   <u>Jones</u>, 129 F.4th at 1182.  This Court noted that each batched arbitration under Coinbase's

27   Batch Arbitration Provision proceeds as a single consolidated arbitration with one hearing,

28   one procedural calendar, one set of filing and administrative fees, and one final award, and

the Batch Arbitration Provision expressly provides that it "in no way" authorizes class, collective, or mass arbitration.  <u>Cordero</u>, 2025 WL 2223495, at *5.

This Court then contrasted Coinbase's arbitration procedures from the mass arbitration procedures in <u>Heckman</u>, which included bellwether trials, page and discovery limits, and asymmetric appeal rights.  <u>Id.</u>  This Court concluded that Coinbase's agreement contains none of those "red flags" because it has "no bellwether or representative proceedings that bind absent parties."  <u>Id.</u>  On that basis, this Court held that the Batch Arbitration Provision in Coinbase's Arbitration Agreement provides for bilateral consolidated arbitration within the scope of the FAA.  <u>Id.</u>  Therefore, the <u>Discover Bank</u> rule did not apply, and the Class Waiver was enforceable; this Court compelled arbitration under the Arbitration Agreement.  <u>Id.</u>

### 3.    Impact of the Supplementary Rules on <u>Cordero</u>

Mr. Carolus, like the plaintiffs in <u>Cordero</u>, argues that the <u>Discover Bank</u> rule applies because the Arbitration Agreement's Batch Arbitration Provision renders the Coinbase arbitration process not bilateral.[2]  He argues that <u>Cordero</u> is distinguishable because the Court did not address the Supplementary Rules that are incorporated into the Arbitration Agreement.  Response to Statement of Recent Decision at 2.  According to Mr. Carolus, once the Batch Arbitration Provision is triggered, the arbitrator applies the Supplementary Rules, which make the arbitration procedures "mass arbitration" and remove the preemptive effect of the FAA.  <u>Id.</u>  Mr. Carolus argues that the Batch Arbitration Provision and Supplementary Rule MA-6 abandon the features of bilateral arbitration because absent parties can be bound to earlier batched proceedings without notice, an opportunity to participate, or a meaningful ability to contest the applicability of

---

[2] The parties dispute whether the Batch Arbitration Provision applies to Mr. Carolus's claims.  Reply at 3; Opp'n at 6–7.  The Batch Arbitration Provision is triggered when the same counsel files 100 or more similar claims against Coinbase, and it is unclear whether Mr. Carolus's proposed class would meet that threshold.  Arbitration Agreement § 1.8; Reply at 3.  However, the Court need not resolve that question because unconscionability is assessed at the time of contracting.  See <u>Ramirez v. Charter Commc'ns, Inc.</u>, 16 Cal.5th 478, 505–06 (2024).

United States District Court
Northern District of California

the rulings.  Opp'n 2–3, 5.  Although <u>Cordero</u> did not expressly address the Supplementary Rules, its reasoning applies here, because those rules do not alter the analysis or outcome.

      To evaluate Mr. Carolus's arguments, the Court must examine how the Batch Arbitration Provision functions alongside the Supplementary Rules and whether, taken together, they alter the bilateral nature of the Arbitration Agreement.  The Coinbase Arbitration Agreement incorporates the AAA Consumer Rules and provides that the AAA will assist in implementing the consolidated batching procedures.  Arbitration Agreement §§ 1.4, 1.8.  In doing so, the AAA applies the Supplementary Rules, which facilitate the resolution of individual disputes.[3]  Opp'n Ex. B (dkt. 34-2).  Under the Batch Arbitration Provision, each claim must be filed individually, and any claimant who objects to consolidation may bring a challenge before a separate arbitrator, with the costs borne by Coinbase.  Arbitration Agreement § 1.8.  Mr. Carolus characterizes this process as lacking the "speed, informality, and individualized nature of bilateral arbitration."  Opp'n at 5.  This argument is unavailing.  Rather, the batching procedure expedites resolution by grouping similar claims, it remains informal by allowing an administrative arbitrator to establish procedures to help resolve disputes promptly, and it preserves individuality by requiring each claim to be filed and considered separately.  <u>See</u> Arbitration Agreement §

---

[3] It is not clear to the Court that the Arbitration Agreement in fact incorporates the Supplementary Rules, but the parties do not seem to contest this point.  <u>See</u> Reply at 4 ("[T]he User Agreement adopts the AAA Mass Arbitration Supplementary Rules.").  The AAA did not adopt the Supplementary Rules that the parties cite to until April 2024, which was after Coinbase issued the 2022 Arbitration Agreement.  <u>See</u> Supplementary Rules (AAA Supplementary Rules attached effective as of April 1, 2024).  In <u>Pandolfi v. AviaGames, Inc.</u> ("<u>Pandolfi 2</u>"), the Ninth Circuit was "not persuaded" that the AAA Mass Arbitration Supplementary Rules applied in an arbitration agreement where the "Supplementary Rules did not exist at the time of [the] arbitration agreement and future versions of the rules were not incorporated as 'the then-current version.'"  No. 24-5817, 2025 WL 2463742 (9th Cir. 2025), at *1.  Nowhere in the text of the 2022 Coinbase Arbitration Agreement does it reference the Supplementary Rules or assign those rules a role in the arbitration process.  Notably, no other cases addressing the Coinbase Arbitration Agreement mention the Supplementary Rules.  <u>See, e.g.</u>, <u>Bielski</u>, 84 F.4th 1003; <u>Aggarwal</u>, 685 F. Supp. 3d 867; <u>Donovan</u>, 649 F. Supp. 3d 946; <u>Cordero</u>, 2025 WL 2223495; <u>Kamath</u>, 2024 WL 950163; <u>Pearl</u>, 2023 WL 1769190; <u>Flores</u>, 2023 WL 3564756; <u>Kramer v. Coinbase, Inc.</u>, 105 Cal. App. 5th 741 (2024).  As the parties do not dispute whether the Coinbase Arbitration Agreement incorporates the Supplementary Rules, the Court will assess their effect on the enforceability of the Class Waiver.

1.8.

Further, Mr. Carolus asserts that several provisions within Supplementary Rule MA-6 raise "serious due process concerns" by binding future claimants to the outcome of earlier proceedings, without notice or the opportunity to participate. See Opp'n at 5. He reiterated this point at the motion hearing by stating that the Process Arbitrator can bind absent claimants on merits issues under MA-6(c)(9), and that even if the Process Arbitrator could only make administrative decisions, this still violates due process because the Process Arbitrator can decide whether any of its decisions are binding on absent parties under MA-6(c)(10). Mot. Hearing Transcript (dkt. 51) at 7. However, this argument misconstrues the scope of the Process Arbitrator's authority.

Rule MA-6 creates the role of the "Process Arbitrator" to oversee the preliminary stages of arbitration proceedings subject to the Supplementary Rules. Supplementary Rules MA-6(c). The Process Arbitrator may make administrative determinations, such as filing sufficiency, arbitrator selection, and scheduling, but not substantive merits determinations. See Supplementary Rules MA-6(c)(i)–(xi), MA-6(d); Pandolfi 1, 2024 WL 4051754, at *8 ("Nothing in the AAA Supplementary Rules suggests that the Process Arbitrator has a role in deciding matters beyond those that are administrative or ministerial in nature."). MA-6(c)(x) grants the Process Arbitrator the authority to determine "whether any previously issued rulings by the Process Arbitrator are binding on the subsequent cases." Supplementary Rules, MA-6(c)(x) (emphasis added). Contrary to Mr. Carolus's argument, the Process Arbitrator can only make decisions on non-merit-based issues, so any reliance on prior rulings is limited to those administrative decisions, not substantive merits issues.

The Supplementary Rules also require that future claimants have an opportunity to contest whether prior rulings of the Process Arbitrator apply. Supplementary Rules, MA-6(c)(ix). Mr. Carolus argues that when the Coinbase arbitration process applies these rules, the arbitration looks similar to those in Heckman, where the procedures had a binding effect on substantive liability issues. See Opp'n at 5. The arbitration procedures

in Heckman involved bellwether trials where substantive decisions by the arbitrator were "binding on non-bellwether plaintiffs, who had no chance to participate in the arbitration and who [were] ignorant of the decision until it [was] invoked against them." 120 F.4th at 679. Here, the Batch Arbitration Provision states that it "shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances except as expressly set forth in this provision." Arbitration Agreement § 1.8 (emphasis added); see Cordero, 2025 WL 2223495, at *5. A provision that explicitly disclaims authorizing mass arbitration should not be read to incorporate rules designed to carry out mass arbitration. Claimants are not bound by substantive rulings without notice or the opportunity to contest their applicability.

The Court holds that the Supplementary Rules applied to Coinbase's Batch Arbitration Provision create consolidated but still bilateral procedures without the representative features of mass arbitration that would trigger the Discover Bank rule. The Class Waiver is therefore enforceable. Because the Arbitration Agreement remains governed by the FAA, the Court does not need to reach Mr. Carolus's unconscionability arguments under the Discover Bank rule.

### D.    Other Substantive Unconscionability Arguments

The Court next addresses Mr. Carolus's remaining substantive unconscionability arguments under traditional unconscionability principles. He makes three: (1) the Class Waiver and Batch Arbitration Provision violate due process because the Supplementary Rules bind absent plaintiffs; (2) the Arbitration Agreement is illusory because Coinbase may unilaterally terminate proceedings by withholding payment; and (3) the attorneys' fee provision is unconscionable. Opp'n 9–15. The Court considers Mr. Carolus's first argument because it falls under the Class Waiver exception to the Delegation Clause preserved for judicial review. See Cordero, 2025 WL 2223495, at *3, 6–8 (assessing the enforceability of the Class Waiver based on the batching procedures as within the scope of the Class Waiver exception). The remaining arguments do not appear to fall within any

1    exception, and courts have recognized that determining whether such claims are carved out

2    of the Delegation Clause is itself a question for the arbitrator.  Pearl, 2023 WL 1769190, at

3    *8.  Nonetheless, the Court addresses them briefly in an abundance of caution.  Finally, the

4    Court considers whether the Ninth Circuit decision in Pandolfi 2 affects the

5    unconscionability analysis.

6                        **1.        Binding Absent Parties**

7          First, Mr. Carolus argues that the Class Waiver is unconscionable because the

8    Supplementary Rules operate in a representative manner that binds absent parties without

9    due process.  Opp'n 11–15.  Similar to the argument he makes regarding Discover Bank,

10   he contends that a Process Arbitrator may apply earlier rulings as binding precedent in

11   later cases without notice or an opportunity to be heard.  Id. (citing MA-6).  As discussed

12   above, this argument misconstrues the scope of Supplementary Rule MA-6, which grants

13   the Process Arbitrator authority over administrative matters only, but reserves substantive

14   issues for a Merits Arbitrator.  See Supplementary Rules, MA-6(c)(i)–(xi); MA-6(d); MA-

15   7.  Courts have likewise recognized that, under the Supplementary Rules, AAA Process

16   Arbitrators do not decide consequential issues of arbitrability or bind absent claimants.

17   See Pandolfi 1, 2024 WL 4051754, at *8 (the district court acknowledged that Process

18   Arbitrators "do not have the authority to decide "gateway issues of arbitrability [which] are

19   more consequential in nature," and if they did have this authority, "then there would be

20   serious due process concerns.").  Accordingly, the Supplementary Rules reserve gateway

21   issues of arbitrability outside the scope of the Court's jurisdiction for the Merits Arbitrator.

22         The Process Arbitrator does not bind absent claimants to future rulings, and the

23   Supplementary Rules require future claimants to have the opportunity to participate and

24   contest whether prior rulings of the Process Arbitrator apply.  See Supplementary Rules,

25   MA-6(c)(ix) ("The Process Arbitrator must allow the parties in these subsequently filed

26   cases the opportunity to address the applicability of any rulings to these cases before

27   making any final determination.").  Furthermore, Mr. Carolus argues that the Process

28   Arbitrator may bind future claimants on jurisdictional issues without input from claimants,

1    and that alone is enough to raise due process concerns.  Opp'n at 12 n.10; Mot. Hearing

2    Transcript at 7.  As discussed above, the Court hears challenges to the enforceability of the

3    Delegation Clause, and Supplementary Rule MA-6(c)(ix) provides a mechanism for

4    claimants to address the applicability of jurisdictional issues that could bind them in a

5    future batching.  Coinbase's procedures, therefore, do not bind absent parties or deprive

6    them of meaningful participation.  For these reasons, the Court holds that the Class Waiver

7    is not substantively unconscionable and therefore is enforceable.

### 2.    Refusal to Pay Arbitration Fees

9        <u>Second</u>, Mr. Carolus argues that the Arbitration Agreement is illusory because

10   under Supplementary Rule MA-10(d)–(e), Coinbase may unilaterally terminate arbitration

11   by refusing to pay arbitration fees.  Opp'n at 13.  This challenge does not fall under any of

12   the exceptions to the Delegation Clause,[4] and therefore belongs to the arbitrator to resolve.

13   Nonetheless, the argument appears unpersuasive.  The Supplementary Rules do not allow

14   for unilateral termination because both parties are equally responsible for fees, and the

15   AAA provides notice and an opportunity to cure where either side can cover the

16   nonpayment to avoid suspension or termination.  Supplementary Rules, MA-10(d)–(e);

17   Arbitration Agreement § 1.8.  Importantly, if Coinbase withheld fees here, Mr. Carolus

18   would receive precisely the remedy he seeks: litigation in federal court.  The outcome does

19   not "shock the conscience" or render the agreement unreasonably favorable to Coinbase.

20   If anything, it creates a safeguard for consumers in the event that Coinbase fails to pay.

21   Although the arbitrator must ultimately decide this argument, as presented, it does not

22   appear to demonstrate substantive unconscionability.

---

[4] The Delegation Clause provides that "except as expressly contemplated in the subsection entitled 'Batch Arbitration,' all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator."  Arbitration Agreement § 1.6.  Here, Mr. Carolus's argument relies on the Supplementary Rules, which only apply if the Batch Arbitration Provision is triggered.  Because the argument falls within that carve-out, the Delegation Clause's fee-payment exception does not apply, and the arbitrator must decide this issue.

### 3.    One-Sided Attorneys' Fees Provision

<u>Third</u>, Mr. Carolus argues that the Arbitration Agreement is substantively

unconscionable because it contains a one-sided attorneys' fees provision that has a

potential chilling effect on future claimants.  Opp'n at 14–15 (citing Arbitration

Agreement § 1.7).  Again, because this argument does not fall within an exception to the

Delegation Clause, the arbitrator must decide this question.  Nonetheless, this Court briefly

addressed this argument in <u>Cordero</u>.  2025 WL 2223495, at *8.  There, the plaintiffs relied

exclusively on case law from the employment context prohibiting employers from

requiring employees to bear any arbitration-related expenses that they would not have

incurred in court.  <u>Id.</u> (citing <u>Storms v. Paychex, Inc.</u>, No. LA CV21-1534 JAK, 2022 WL

2160414, at *14–15 (C.D. Cal. Jan. 14, 2022)).  Here, Mr. Carolus similarly relies on

employment case law.  Opp'n at 14.  He cites <u>Ramirez</u>, where an asymmetric attorneys'

fee provision violated a California employment statute, a very different context than

present in this case.  <u>Id.</u> (citing 16 Cal. 5th at 509–13).  While the issue belongs to the

arbitrator to decide, as presented, the attorneys' fees provision does not appear to give rise

to substantive unconscionability.

### 4.    The Ninth Circuit <u>Pandolfi</u> Decision

Mr. Carolus recently filed a Statement of Recent Decision to highlight the Ninth

Circuit's memorandum disposition in <u>Pandolfi</u> 2, 2025 WL 2463742.  Second Statement of

Recent Decision (dkt. 44).  He argues that the Ninth Circuit held that "the AAA's batching

procedures—the very same procedures at issue here—rendered both the delegation clause

and arbitration agreement substantively unconscionable," and that therefore the Coinbase

Delegation Clause here is unconscionable.  <u>Id.</u> at 2.

However, the clause at issue in <u>Pandolfi</u> 2 was part of the AviaGames Terms of

Service, distinct from both the AAA Mass Arbitration Supplementary Rules and the

Coinbase 2022 User Agreement (which contains the Coinbase Batch Arbitration Provision

and the relevant Delegation Clause).  <u>See Pandolfi</u> 1, 2024 WL 4051754, at *2 (underlying

district court opinion explaining that the "Defendants moved to compel arbitration based

on the arbitration agreement in the December 2022 and July 2023 Terms" and that agreement contained a bellwether provision.).  In Pandolfi 2, the Ninth Circuit upheld the district court's finding of procedural unconscionability because the terms of the AviaGames arbitration agreement were "presented in small, light grey font and span[ned] about three pages of single-spaced text … [and] there is no bolding or underlying to call out any terms, including … the delegation clause and bellwether provision."  Pandolfi 1, 2024 WL 4051754, at *10.  The AviaGames agreement also included a substantively unconscionable bellwether provision, which required coordinated trials that bound absent parties to prior decisions.  Id.  The court identified substantive unconscionability in the AviaGames contract due to its unilateral modification of terms and the potential chilling effect on claimants, rather than in the AAA rules.  Id., at *5–10.

Mr. Carolus also argues that the Pandolfi 2 court held that it was unconscionable to incorporate AAA rules that "are subject to change."  Id.  However, when the Ninth Circuit stated that there is a "modest degree of procedural unconscionability because [the arbitration agreement] incorporates AAA rules that are subject to change," it is more sensible to read that statement as meaning that the Terms of Use's incorporation of the AAA rules was subject to change.  See Pandolfi 2, 2025 WL 2463742, at *2.  The underlying district court decision held that it was unfair that AviaGames changed its Terms of Use to incorporate the AAA rules without providing users with notice.  Pandolfi 1, 2024 WL 3558853, at *10.  Reading Pandolfi 2 to suggest that the AAA rules are themselves unconscionable would have far-reaching consequences and is inconsistent with the nature of memorandum dispositions, which are not intended to create novel legal holdings.  See Grimm v. City of Portland, 971 F.3d 1060, 1067 (9th Cir. Aug. 21, 2020).

This Court concludes that the Ninth Circuit's holding in Pandolfi 2 is distinguishable because it is based on a different underlying agreement, and that the reference to unconscionability refers to the agreement itself, not to the AAA rules.  Having concluded that the Coinbase Arbitration Agreement is not unconscionable, and that Pandolfi 2 does not alter that conclusion, the Court holds that the Coinbase Arbitration

1  Agreement covers this dispute and is enforceable.

2      **E.      Stay**

3          Finally, Coinbase asks the Court to stay this action pending completion of

4  arbitration proceedings.  Mot. at 13.  "When a district court finds that a lawsuit involves an

5  arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels

6  the court to stay the proceedings."  <u>Smith v. Spizzirri</u>, 601 U.S. 472, 478 (2024) (citing 9

7  U.S.C. § 3 (a court "shall on application of one of the parties stay the trial of the action

8  until such arbitration has been had in accordance with the terms of the agreement.")).

9  Accordingly, the Court stays these proceedings pending arbitration.

10 **IV.    CONCLUSION**

11          For the foregoing reasons, the Court GRANTS the motion to compel arbitration and

12 STAYS these proceedings pending arbitration.

13      **IT IS SO ORDERED.**

14          Dated: October __7__, 2025



CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California